GISKAN SOLOTAROFF & ANDERSON LLP
90 Broad Street, 2nd Floor
New York, New York 10004
(212) 847-8315
Catherine E. Anderson
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
ADDISON SANDOVAL,

|  |  |  |
|---|---|---|
| | Plaintiff, | **COMPLAINT** |
| -against- | | Case No.: |
| UPHOLD HQ INC., | | |
| , | Defendant. | |

------------------------------------------------------------------------X

     Plaintiff, Addison Sandoval, by his attorneys Giskan Solotaroff & Anderson LLP, for his complaint against Defendant Uphold HQ Inc., alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

     1.     Defendant Uphold is a global digital currency money platform. Uphold enables consumers to invest with Uphold via its mobile applications, products, software, websites, APIs and other services (*i.e.*, Uphold's "Platform). From July through October 2020, Plaintiff invested more than $45,000.00 with Uphold. In December 2020, Uphold denied, and continues to deny, Plaintiff access to his investments and has failed to provide a refund.

     2.     Plaintiff relied on Uphold's material representations and omissions that its products, including Uphold Earn and Universal Dollar (UPUSD), were, *inter alia*, safe, secure, transparent, backed by the US dollar with a 1:1 ratio, and FDIC insured. Uphold additionally promised Plaintiff interest rate returns of 10% to 13% per annum on his investments. As a result of Uphold's materially false representations and omissions, Plaintiff was induced to invest more than $45,000 with Uphold

between July 2020 and October 2020.

3.      Uphold also led Plaintiff to believe that his interest earning investments were readily accessible and could be withdrawn upon the six month maturation date via a debit card Uphold provided to Plaintiff.  However, in December 2020, Uphold denied Plaintiff access to his investments and closed his account.  At this time, Plaintiff still does not have access to his investments with Uphold and has not received reimbursement of his funds.

4.      On February 25, 2021, Plaintiff filed a complaint in the Superior Court of the State of California, County of Los Angeles against Uphold, alleging, *inter alia*, violation of (1) California's Unfair Business Practices, California Business & Professions code § 17200, *et seq.*; (2) California's False Advertising Law, California Business & Professions Code§ 17500, *et seq.;* and (3) California's Consumer Legal Remedy Act, Civ. Code § 1750, *et seq.*

5.      On July 20, 2021, the Superior Court of the Sate of California granted Defendant Uphold's motion to stay or dismiss the action on the grounds of inconvenient forum based on the mandatory forum selection clause in the Uphold User Agreement which designates exclusive jurisdiction to the courts (state and federal) located in the State of New York, County of New York.

## THE PARTIES

6.      Plaintiff Addison Sandoval is an individual residing in Los Angeles, California.

7.      Defendant Uphold HQ Inc. ("Uphold") is a South Carolina company with its headquarters located at 6 West 18th Street, 3rd Floor, New York, New York 10011.  Uphold conducts business as a cloud-based money platform that connects banks, credit and debit cards, and bitcoin to digital wallets.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §1332 based on diversity of citizenship of the parties and the amount in controversy

exceeding $75,000.  This Court has personal jurisdiction over Defendant because Defendant is located in New York and conducts substantial business in New York.  Moreover, Section 5.7 of the Uphold User Agreement between Plaintiff and Uphold contains a mandatory New York forum selection clause providing, in relevant part:

> You agree that the laws of the State of New York, without regard to principles of conflict of laws, govern this Agreement and any claim or dispute between you and us except to the extent governed by U.S. federal law.  You consent and submit to the exclusive jurisdiction of the courts (state and federal) located in the State of New York, County of New York in connection with any dispute or controversy arising under or related to this Agreement, the Terms and Conditions or the subject matter hereof or thereof.

9.      Venue is properly before this Court pursuant to 28 U.S.C. §1391(b)(2) as this district is where substantial part of the events or omissions giving rise to the claim occurred, and where a substantial part of property that is the subject of the action is situated.

## FACTS

10.      Uphold promotes itself as a leading global digital currency money platform and provider of credit solutions via cryptocurrency.  Uphold represents itself to be "a digital money platform providing consumers worldwide with convenient and secure access to traditional currencies, cryptocurrencies, and other investments."  Uphold advertises itself to consumers via the world wide web.

11.      Uphold represents on its website, https://uphold.com/en/resources/about, that Uphold's "unique 'Anything-to Anything' trading experience enables customers to trade directly between asset classes with embedded payments" and that its Platform is "[b]uilt on a core of proprietary technologies and e-money apps" providing "safe, transparent, fair, and affordable financial services."

12.      In a Business Wire press release dated March 8, 2019, Uphold announced its "support of a revolutionary stablecoin that aims to propel cryptocurrency into the mainstream.

The stablecoin, known as the 'Universal Dollar (UPUSD),' is issued by Universal Protocol Pte. Ltd. and will initially be available on the Uphold Platfrom."  Uphold's press release stated that the Universal Dollar or UPUSD "is pegged on a 1:1 ratio to the U.S. Dollar. . . . UPUSD is 100% backed with the U.S. dollar.  U.S. dollars are held at banks located in the United States with the intention of being eligible for FDIC 'pass-through' deposit insurance, subject to applicable limitations."  In this press release, Uphold's Chief Operating Officer, JP Thieriot, stated "[t]he Universal Dollar shows that crypto is finally delivering on the promise of mass appeal. . . . the protections, interoperability and financial services offers a number of benefits to Uphold members."

13.     Uphold has touted the Uphold Earn program and Universal Dollar directly to consumers on the world wide web.  In promotional material at uphold.com1/en/blog/uphold-earn-and-uphold-borrow, Uphold represented on October 22, 2018, that "Customers Who Purchase the Universal Dollar Can Opt-in to Uphold Earn."  Uphold stated:

> Uphold will offer eligible customers a U.S. Dollar Stablecoin (Universal Dollar), a fully-transparent, digital asset that is backed 1-to-1 with U.S. dollars to be held at U.S. domiciled, FDIC-insured banks.  Those customers who purchase the Universal Dollar can opt-in to Uphold Earn, which functions much like a traditional banking product, and can receive attractive and competitive rates, currently as high as five percent.
>
>        ****
> Uphold Earn and Borrow mark the first time that we've seen fiat currencies, stablecoin currencies and blockchain working together to benefit a mass consumer market.  Traditionally, the average consumer has been wary of digital currency for two reasons: volatility and a fear that, if they lose their key, they lose their money.  Universal Dollar helps solve for both of these problems.
>
> The Universal Dollar has many of the same user safeguards and benefits expected of conventional financial assets, including:
>
> Safety:  fully reserved, built-in loss recovery. . . Reduced exchange risk: thanks to a "detachable" wallet that permits "self-custody" at exchanges.
>
>        ****

4

Thanks to the efficiencies of blockchain, the unique properties of crypto assets and smart contract infrastructure, Uphold and Cred customers can benefit from a more efficient, transparent and equitable financial services structure.

14.     Relying on Uphold's material representations concerning, *inter alia*, the safety, transparency and convenience of the Uphold Platform, Uphold Earn and the Universal Dollar, Plaintiff enrolled in Uphold's Platform and created an Uphold online account on March 4, 2020.

15.     On April 29, 2020, Uphold promoted its earning program on Twitter and represented that users of #CredEarn can "earn up to 10% on #crypto, national currencies, #stablecoins and gold." Uphold further represented that consumers can "Spend what you've earned with the #Uphold Card."

16.     Uphold sent Plaintiff a targeted email touting Uphold Earn, which stated:

Hi Addison,

Do you like earning interest on the dollars you hold? Well, we have good news! Cred[1] currently offers Uphold customers highly competitive rates on US dollars, up to 12% APY. Log into your CredEarn dashboard and take advantage now.

At the bottom of this email, Uphold provided a blue icon box labeled "Start earning" for Plaintiff to click on and enroll in this offer.

17.     In another email targeted directly to consumers in the Fall 2020, Uphold promoted "highly competitive rates on USDC, USDT, and UPUSD to Uphold customers." Uphold represented that, "[w]hile returns are offered by traditional banks still sit near zero, these stablecoins are available at interest rates up to 12% for USDC and USDT, and up to 13% for UPUSD." Uphold represented that "[t]hese rates apply to any member who has committed to a program from October 1, 2020, and will last until 5 PM PST on October 14, 2020. Log into your CredEarn dashboard now to take advantage of this promotion!" At the bottom of this email,

---

[1] Uphold was attempting to rebrand itself as "Cred."

Uphold provided a blue icon box labeled "Start earning" for consumers to click on to enroll in this offer.

18.     Uphold thus has promoted its Uphold Earn and Universal Dollar products to Plaintiff and other consumers as safe, transparent, FDIC-insured, and backed by the U.S. dollar. Uphold also has represented that Plaintiff and other consumers can access their investments and make withdrawals with the Uphold debit card.  Uphold failed to inform Plaintiff that he would not be able to access his Uphold Earn and Universal Dollar deposits or make withdrawals.

19.     In or around July 1, 2020,  Plaintiff enrolled in Uphold Earn and made an initial investment $5,000 in his Uphold Wallet, which according to Uphold would earn 10% annually, with a six month term.  Uphold provided Plaintiff with a debit card to make investments and to access his funds in his Uphold Wallet.  Plaintiff linked his Uphold Wallet to his conventional bank account.

20.     Relying on Uphold's representations as set forth above, Plaintiff was induced to invest a total of $45,411, which was held in his Uphold wallet.  As a result of Uphold's material misrepresentations and omissions as set forth above, Plaintiff believed his investments with Uphold were secure, interest earning, and readily accessible upon maturation at the end of the six month term for his own use.  Based on the misrepresentations and omissions of Uphold concerning the safety, security, accessibility, investment grade and guaranteed returns of Uphold Earn and the Universal Dollar, Plaintiff made the following investments in Uphold Earn:

|     | Date Invested | Amount Invested | Guaranteed Return | Term/Reversion |
| --- | --- | --- | --- | --- |
| 1.  | July 1, 2020  | $5,000 | 10% per annum | 6 months |
| 2.  | July 14, 2020 | $2,500 | 10% per annum | 6 months |
| 3.  | July 24, 2020 | $7,494 | 10% per annum | 6 months |

| 4. | August 11, 2020 | $2,509 | 10% per annum | 6 months |
|---|---|---|---|---|
| 5. | August 14, 2020 | $2,500 | 10% per annum | 6 months |
| 6. | August 24, 2020 | $2,500 | 10% per annum | 6 months |
| 7. | September 9, 2020 | $4,907 | 10% per annum | 6 months |
| 8. | September 12, 2020 | $5,000 | 10% per annum | 6 months |
| 9. | September 30, 2020 | $5,000 | 10% per annum | 6 months |
| 10. | October 10, 2020 | $5,001 | 13% per annum | 6 months |
| 11. | October 12, 2020 | $3,000 | 13% per annum | 6 months |
|  | Totals | $45,411 | $2,366 | $47,777 |

21.     On or around October 23, 2020, Uphold discontinued Uphold Earn consumer access for withdrawal of funds via its online Platform.  Uphold sent Plaintiff an email stating the Uphold was discontinuing its Uphold Earn product.  When Plaintiff contacted Uphold to inquire about the discontinuation of Uphold Earn, representatives from Uphold replied that the program was "cancelled for commercial reasons."

22.     In or around this time, Plaintiff contacted his traditional bank which was linked to his Uphold Wallet in order to secure his investments with Uphold.   Although Plaintiff's bank opened an investigation, it was only able to issue Plaintiff a provisional credit of $10,000.00.

23.     On December 3, 2020, Uphold sent Plaintiff an email stating:

We're very sorry to tell you that we can no longer offer you an account.  As a regulated business, sometimes we have to make difficult decisions like this as new information becomes available.  Don't worry, your funds are safe and we'll be in touch shortly about handling any available balance.

24.     At or around this same time, Plaintiff was suspended from the Uphold Platform without reason or justification.  Uphold informed Plaintiff at this time that his Uphold account

was closed.

25.     Plaintiff has made numerous complaints to Uphold's customer service team online via the TrustPilot platform concerning his inability to access and withdraw his investments.  Plaintiff repeatedly has requested that Uphold refund his investments to no avail.

26.     On December 29, 2020, Plaintiff provided written notice to Uphold as required by the California Consumer Legal Remedies Act and again requested a refund of his monies.

27.     To date, Plaintiff has not received a return of any of his principal investments or interest thereon from Uphold.

## FIRST CAUSE OF ACTION
### VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349

28.     Plaintiff repeats and realleges each preceding paragraph of the Complaint as if fully set forth herein.

29.     Plaintiff is a "person" and a member of the consuming public within the meaning of GBL §349(h).

30.     GBL §349(a) states: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

31.     Defendant's acts and practices alleged herein took place within New York and constitute acts, uses, or employment of deception, fraud, unconscionable and unfair commercial practices, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of merchandise, and with the subsequent performance, of Defendant in violation of § 349 of New York's General Business Law, making deceptive and unfair acts and practices illegal.

32.     Defendant's conduct is deceptive because it is likely to mislead consumers and

the public, including Plaintiff, by making them believe, falsely, that the Uphold Earn and Universal Dollar were safe, transparent, FDIC-insured, backed by the U.S. dollar, would generate between 10% and 13% per annum, and that Plaintiff could access his investments and make withdrawals upon the six month maturation period with his Uphold debit card. Defendant's representations and omissions were materially false and misleading and likely to deceive the consuming public because Defendant knew and failed to disclose that Plaintiff would not be able to access his funds or make withdrawals.

33.     The deceptive acts and practices of Defendant have directly, foreseeably, and proximately caused damages and injury to Plaintiff.  Indeed, Defendant's false and deceptive representations caused Plaintiff to suffer damages, including investing more than $45,000.00 with Uphold which Plaintiff cannot access or withdraw, and which Plaintiff would not have invested had he known that Uphold would deny him access to his investments and close his account.

34.     In addition to pecuniary losses, Plaintiff has suffered actual harm as a result of Defendant's violations GBL §349(a), including but not limited to, the annoyance, harassment, time, frustration, and anger due to Defendant's violations of GBL §349.

35.     Plaintiff is entitled to pursue claims against Defendant for damages, statutory damages, treble damages, exemplary damages, injunctive relief, costs and attorney's fees pursuant to GBL §349(h) to redress Defendant's violations of GBL §349(a).

36.     Plaintiff has no adequate remedy of law.

## SECOND CAUSE OF ACTION
### VIOLATIONS OF THE CALIFORNIA CONSUMER PROTECTION LAWS

37.     Plaintiff repeats and realleges each preceding paragraph of the Complaint as if fully set forth herein.

38.     In the event that the New York GBL § 349 does not provide redress to Plaintiff's claims against Defendant, the following alternative consumer protection statutes provide a basis for redress based on Defendant's unfair, deceptive, and/or misleading acts, practices and conduct in misrepresenting and misleading the consumer:  The California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* and/or the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* and/or the California False Advertising Law, Bus. & Prof. Code §§ 17500, *et seq.*

39.     Plaintiff, a resident of California, has been injured as a direct and proximate result of Defendant's violations of the California consumer protection laws recited in this Count.

40.     Plaintiff has suffered and incurred actual damages as a direct and proximate result of Defendant's violations of the California consumer protection laws recited in this Count.

41.     To the extent required to state a claim under any statute listed in this Count, Plaintiff reasonably relied on Defendant's misrepresentations, unfair and deceptive statements, material omissions.

42.     Defendant's unfair and deceptive acts were knowing, willful and/or reckless.

43.     Plaintiff seeks damages, statutory damages, exemplary damages, punitive damages, an injunction, restitution, disgorgement attorney's fees and costs, and all other appropriate legal and equitable relief and remedies for Defendant's violations of the state consumer protection laws recited in this Count.

<u>**THIRD CAUSE OF ACTION**</u>
**UNJUST ENRICHMENT**

44.     Plaintiff repeats and realleges each preceding paragraph of the Complaint as if fully set forth herein.

45.     Defendant has denied Plaintiff access to his investments with Uphold.  Had

Plaintiff known that he would not be able to access or withdraw his investments with Uphold, he would not have invested with Uphold.

46.     As a result, Plaintiff has conferred a benefit on Defendant.

47.     Defendant had knowledge of this benefit and voluntarily accepted and retained the benefit conferred.

48.     Defendant will be unjustly enriched if it is allowed to retain the aforementioned benefits, and Plaintiff is entitled to recover the amount by which Defendant was unjustly enriched at Plaintiff's expense.

### FOURTH CAUSE OF ACTION
**FRAUD**

49.     Plaintiff repeats and realleges each preceding paragraph of the Complaint as if fully set forth herein.

50.     Uphold made materially false representations and omissions to Plaintiff concerning the Uphold Platform, Uphold Earn and the Universal Dollar.  At all relevant times Defendant knew, or reasonably should have known, and failed to disclose that Plaintiff's investments with Uphold were not, *inter alia*, safe and secure, transparent, FDIC insured, backed by the U.S. dollar, generating guaranteed interest between 10% and 13%, or readily accessible upon the six month maturation date.

51.     Defendant made these false and misleading representations and omissions knowingly, recklessly, and/or without regard for their truth or falsity, and with the intent to induce Plaintiff to invest with Uphold.

52.     Plaintiff justifiably relied upon the false representations and omissions made by Defendant by investing more than $45,000.00 with Uphold.   Had Plaintiff known that he would not be able to access his investments or make withdrawals, and that Uphold would close his

account without reason or justification or a return of his investments, Plaintiff would not have invested with Uphold.

53.     As a direct and proximate result of Plaintiff's reliance upon the false representations and omissions of Defendant, Plaintiff has suffered actual damages.  Because Defendant's conduct alleged herein is willful and wanton, Plaintiff is entitled to punitive, as well as actual, damages.

## FOURTH CAUSE OF ACTION
### BREACH OF CONTRACT

54.     Plaintiff repeats and realleges each preceding paragraph of the Complaint as if fully set forth herein.

55.     Uphold's General Terms and Conditions, a copy of which is attached here as Exhibit A, govern consumer's access and use of Uphold's mobile applications, products, software, websites, APIs and other service (*i.e.*, Uphold's "Platform").  When Plaintiff enrolled in Uphold's Platform on or around March 4, 2020, he agreed to the Terms and Conditions, and a contract between Plaintiff and Defendant was formed.

56.     Section 5.3 of the Terms and Conditions provides:

If your Account is terminated, or subject to verification requirements, you will generally be permitted to transfer funds off the Platform for thirty (30) days unless those transfers are otherwise prohibited.

57.     On or around December 3, 2020, Uphold informed Plaintiff that it could no longer offer him his Account with Uphold.  Uphold then cut off Plaintiff's access to his account with Uphold.  Despite Plaintiff's numerous written complaints to Uphold in December 2020 concerning Plaintiff's inability to access his investments with Uphold and transfer his funds, Uphold denied Plaintiff the opportunity to access and transfer his funds off the Uphold Platform without reason or justification.

58.     Uphold breached Section 5.3 of the Terms and Conditions by failing to permit Plaintiff to transfer his funds off the Platform, despite Plaintiff's attempts and requests to do exactly this, within the thirty (30) days following Uphold's December 3, 2020 notice that it had terminated Plaintiff's Account.

59.     As a result of Uphold's breach of the User Agreement, Plaintiff has been unable to transfer his funds off the Uphold  Platform.  As a result, Plaintiff has suffered damages in an amount to be determine at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

A.  Actual and compensatory damages for injuries suffered by Plaintiff;

B.  Awarding Plaintiff statutory and exemplary damages where permitted;

C.  Awarding Plaintiff punitive damages;

D.   Reasonable attorney's fees and costs of this action and pre-judgment interest under the state consumer fraud statutes; and

E.  Such other relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  September 10, 2021
      New York, New York

**GISKAN SOLOTAROFF
& ANDERSON LLP**

*/s/ Catherine E. Anderson*
Catherine E. Anderson, Esq.
Email: canderson@gslawny.com
90 Broad Street, 2nd Floor
New York, New York 10004
(212) 847-8315

*Attorneys for Plaintiff Addison Sandoval*