GISKAN SOLOTAROFF & ANDERSON LLP
Catherine E. Anderson
canderson@gslawny.com
90 Broad Street, 2nd Floor
New York, New York 10004
(212) 847-8315

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
Rachel Geman
rgeman@lchb.com
250 Hudson Street, 8th Floor
New York, New York  10013-1413
Telephone:  (212) 355-9500

*Attorneys for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADDISON SANDOVAL, LIONEL DUCOTE, NICHOLAS KING, and RICHARD NEAL, on behalf of themselves and other individuals similarly situated,<br><br>                    Plaintiffs,<br><br>                    -against-<br><br>UPHOLD HQ INC.,<br><br>                    Defendant. | Case No.  1:21-cv-07579 (VSB)(BCM)<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT** |

        Plaintiffs and Proposed Class Representatives Addison Sandoval, Lionel Ducote,

Nicholas King, and Richard Neal, by their attorneys, bring this complaint against Defendant

Uphold HQ Inc. ("Uphold" or "Defendant") on behalf of themselves and all other similarly

situated consumers who invested in the Uphold Earn/Cred Earn program (the "Class").

## PRELIMINARY STATEMENT

1.      This is a consumer fraud class action against Defendant Uphold, a digital currency money platform with seven million customers.  On Uphold, consumers exchange and transact in traditional (fiat) currencies, cryptocurrencies, and other products.  Uphold's stated goal is to bring cryptocurrency products to the mass consumer market.

2.      Starting in 2019, Uphold actively, uniformly, and deceptively promoted an investment in a product called "Uphold Earn" (which Uphold also referred to as "Earn" or "Cred Earn") (together, "Earn").  Consumers' investments in "Earn" became worthless in November 2020, when the company behind "Earn" (Cred, Inc.) ("Cred") went bankrupt following egregious mismanagement.

3.      Uphold knew or should have known "Earn" was a worthless product, or at minimum, one with undisclosed material risks, and failed to disclose these facts despite an obligation to do so.  Instead, Uphold hid the information, and continued to benefit unjustly and improperly from its "Earn" product.

4.      Prior to Cred's crash and then bankruptcy, and as of 2019, Uphold and Cred had a marketing agreement, the terms of which are not public.  Cred's CEO, who also served as one of Cred's only two Board Members and as the Director of Operations (in fact, the person solely responsible for operations) was also on Uphold's (small) Board.  Uphold assisted in Cred's operations and acted as Cred's custodial wallet.  Thus, Uphold had superior knowledge relative to its consumers as to the true nature of Cred and the "Earn" product.

5.      Further, and alternatively, Uphold made partial representations that rendered its material omissions about the true nature of "Earn" particularly culpable.

6.      Uphold's signature proprietary product was its own Universal Dollar, a stable coin pegged to the U.S. Dollar.  In 2019, Uphold released, and then at all times actively

-2-

promoted, its Universal Dollar as (1) a safe product to own and with which to transact in cryptocurrencies, and (2) an opportunity to earn money for those consumers who "opted-in" to the "Earn" program (that is, invested Uphold Universal Dollars into a money-making opportunity).

7.     In all of its marketing, Uphold treated "Earn" as an Uphold product.  Further, Uphold designed and operated its website to represent that Earn was part of the Uphold family of products.

8.     Uphold benefitted from consumers' use of Uphold's Universal Dollar, and also from their investments with "Earn."  Uphold used "Earn" to position and differentiate itself as the safe company offering returns on cryptocurrency investments.

9.     Uphold's course of fraudulent and deceptive conduct continued right up to only one week before Cred declared bankruptcy.

10.     Following Cred's demise, Uphold exacerbated its misconduct by failing to provide accurate information to Uphold users about Cred and their investments in Earn and by representing, *inter alia*, that their investments were "safe."

11.     Uphold's conduct was consumer-directed and uniform.  It used written and uniform marketing materials.  Uphold is subject to uniform law based on a provision in its terms of service requiring the application of New York law to disputes with consumers.

12.     Any reliance by Uphold on its "Earn" disclaimer is unenforceable for various reasons, among them that it was not applicable to U.S. residents, and that the context of the transaction rendered it, at best, ambiguous.

13.     As a result of its misconduct in failing to disclose known information, despite its superior knowledge and its partial statements, in misleadingly conflating Uphold with Cred as a

marketing ploy, and finally, in improperly retaining consumers' funds, Uphold has violated New York law.  Because of its uniform conduct, class treatment of consumers' claims is appropriate and necessary.

14.     Plaintiffs are entitled to restitution, damages, and (under the New York General Business Law) penalties.

## THE PARTIES

15.     Plaintiff **Addison Sandoval** is an individual residing in Los Angeles, California who invested more than $45,000 with Uphold "Earn."

16.     Plaintiff **Lionel Ducote** is an individual residing in Cathedral City, California who invested more than $13,000.00 with Uphold "Earn."

17.     Plaintiff **Nicholas King** is an individual residing in Scottsdale, Arizona who invested approximately $6,400.00 with Uphold "Earn."

18.     Plaintiff **Richard Neal** is an individual residing in Mountain Home, California who invested thousands of dollars' worth of cryptocurrencies with Uphold "Earn."

19.     Defendant **Uphold HQ Inc.** ("Uphold") is a South Carolina company with its headquarters located at 6 West 18th Street, 3rd Floor, New York, New York 10011.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over Defendant because Uphold is located in New York and conducts substantial business in New York.  Moreover, Uphold's User Agreement with Plaintiffs and Class Members contained a mandatory New York forum selection clause providing, in relevant part:

> You agree that the laws of the State of New York, without regard to principles of conflict of laws, govern this Agreement and any claim or dispute between you and us except to the extent governed by U.S. federal law.  You consent and submit to the exclusive jurisdiction of the courts (state and federal) located in the State of

-4-

New York, County of New York in connection with any dispute or
controversy arising under or related to this Agreement, the Terms
and Conditions or the subject matter hereof or thereof.

21.     This Court has subject-matter jurisdiction under the Class Action Fairness Act,

Pub. L. 109-2, because the amount in controversy exceeds $5 million in the aggregate and

diversity exists between Plaintiffs and the Defendant there are at least one hundred members of

the Class. 28 U.S.C. § 1332(d)(2), (6).

22.     Venue is properly before this Court pursuant to 28 U.S.C. §1391(b)(2) as

Defendant transacts business and may be found in this District, and a substantial part of the

events or omissions giving rise to the claims alleged herein occurred in this District.

## FACTS

## I.     Uphold.

23.     Uphold was founded in 2013.  It represents itself as "a digital money platform

providing consumers worldwide with convenient and secure access to traditional currencies,

cryptocurrencies, and other investments."

24.     Uphold connects banks, credit and debit cards, and certain cryptocurrencies to

digital wallets. Its platform purports to allow and enable consumers to securely convert and

transact in fiat currencies, cryptocurrencies, and precious metals (including Gold).

25.     Specifically, Uphold represents on its website that its "unique 'Anything-to

Anything' trading experience enables customers to trade directly between asset classes with

embedded payments" and that its platform provides "safe, transparent, fair, and affordable

financial services."  https://uphold.com/en/resources/about.

26.     Uphold charges service fees, conversion fees, and spreads on trades.

27.     Uphold uses common, written channels to advertise its services.  It advertises via

the internet, uniform email marketing materials sent to consumers, and Twitter.

II.    **Uphold's Introduction of its Own Proprietary Stablecoin and Companion Earning Product: "Uphold Earn."**

28.    In late 2018, Uphold announced the creation of a mass-market financial product called Uphold Earn.  As Uphold's Co-Founder and CEO stated, "Uphold Earn and Borrow mark the first time that we've seen fiat currencies, stablecoin currencies and blockchain working together to benefit a mass consumer market."

29.    Uphold represented via press release that it would "offer eligible customers a U.S. Dollar Stablecoin (Universal Dollar), a fully-transparent, digital asset that is backed 1-to-1 with U.S. dollars to be held at U.S. domiciled, FDIC-insured banks."

30.    Uphold further represented that "[t]hose customers who purchase the Universal Dollar *can opt-in to Uphold Earn, which functions much like a traditional banking product*, *and can receive attractive and competitive rates*, currently as high as five percent."  (Emphasis added.)

31.    Uphold marketed its Universal Dollar and its "Earn" program widely as of 2019 and, upon information and belief, this marketing was successful, allowing Uphold itself to grow dramatically.

III.    **The "Earn" Program Was, in Actuality, an Investment in an Irresponsible and Mismanaged Company Called Cred, Inc.**

32.    All the money that Uphold customers invested in the "Earn" program was, in fact, an investment in Cred, a cryptocurrency lender founded in 2018 that went bankrupt in November 2020. It described itself as a "global financial services platform" and "licensed lender" that delivered lending and borrowing services to customers in approximately 140 countries.

33.    Cred was grossly mismanaged and financially troubled from its outset. This conclusion was reached by the Bankruptcy Examiner in the Cred bankruptcy proceedings after

2317533.3

reviewing 13,000 documents and interviewing twenty-three (23) Cred employees—including, notably, Daniel Schatt the CEO of Cred and a member of the Uphold Board of Directors.

34.    Mr. Schatt was in fact the sole director of Cred in charge of all operational issues.

35.    The Examiner stated, "[w]hile swings in cryptocurrency trading value were, after all, a foreseen aspect of the firm's business model. . . Cred's corporate managers did not run the business to effectively counterbalance such risk, as was promised to customers." *In re Cred*, 20-BKR-12836-JTD (ECF Dkt. No. 605, at 9 (3/8/21) ("Examiner Rpt.").

36.    According to the Examiner Report, the fiscal and managerial problems at Cred were clear and pervasive. They included: "(i) un-systemic, chaotic and, in some instances, nonexistent diligence, accounting, and compliance functions; (ii) allowance for currency migration to non-Cred entities operating in mainland China (moKredit), without legal or practical capacity to repatriate capital as and when requested/needed by Cred; and (iii) allocation of important managerial and operating functions to an individual [James Alexander, the former Chief Capital Officer of Cred Inc.] with an extremely worrisome past."  Examiner Rpt. at 8.

37.    Indeed, Cred "excelled at its marketing objectives; but, its failures in the most basic of business functions portended its eventual demise." Examiner Rpt. at 4.

38.    Mr. Schatt, and other senior management, "did not adopt clear and effective policies and procedures for virtually any day-to-day functions. There is little evidence that the Board (*i.e.*, Mr. Schatt) ran the business to ensure operative systems/practices, consistent with customer expectations, and to effectively ward off risks inherent in the business."  Examiner Rpt. at 8.

39.    The Examiner Report recited a long list of due diligence failures in connection with business functions. The Report stated that, "Cred maintained only an informal and 'ad hoc'

diligence process with respect to material aspects of its business, from the hiring of key officers and employees to the deployment of its assets. Cred did not have formal diligence or oversight policies respecting investment decisions, including the selection of asset managers with whom to invest Cred's assets and customer deposits. Nor did it develop and maintain a standardized, formal process for decision-making pertaining to Cred's investment proposals, investment allocations, risk management strategies, or liquidity." *Id.*

40.     Notably, the Examiner Report  also found that the absence of basic accounting procedures and compliance functions that rendered the interest earnings of the "Earn" product illusory: "Cred operated in a similarly undisciplined manner respecting asset management, storage, and transfers. Cred did not maintain records identifying or tracking assets between the CredEarn, CredBorrow, or other programs, and had no discernable method for identifying or tracking specific assets or transfers. Rather, customer assets were comingled and maintained together without a standardized method for distinguishing which assets were deposited by whom and from which program they were derived. Additionally, Cred did not develop and maintain a standardized, comprehensive protocol for tracking customer deposits and for initiating and authorizing transfers. Cred's method for initiating, authorizing, and executing transfers often came through informal channels of communication and all steps were often performed by a single individual without a defined, discernible method of approval or oversight. Moreover, Cred did not maintain reliable records for its trading accounts and did not adopt a regular practice of issuing transaction statements." Examiner Rpt. at 8-9, 100.

41.     The Examiner Report found that "[t]hese deficiencies extended to the accounting and compliance functions. Cred did not have a centralized, integrated accounting function. Certain accounting information was maintained in offline Excel spreadsheets, but they were not

regularly updated. By the time Cred filed for bankruptcy, it had not performed a comprehensive financial reconciliation of accounts in almost a year. Cred did not implement a formal reporting or compliance policy concerning its investments (either internally, with respect to employees tasked with overseeing investments, or externally, with respect to asset managers overseeing Cred's investments)." Examiner Rpt, at 9. It also determined that Cred, Inc. "was tightly bound to the fortunes of moKredit – a Chinese microlender owned by Lu Hua, Cred's co-founder, Director, and 50% equity owner. Cred, Inc.'s business primarily involved converting customer cryptocurrencies into fiat currency for moKredit to lend to its borrowers." *Id*.  Uphold, however, failed to disclose this (or any other) material fact to consumers.

42. As the Examiner Report stated, "[c]onverting cryptocurrencies into fiat currency exposed Cred to fluctuations in cryptocurrency trading prices, a risk that required constant hedging. Even though Cred placed a significant portion of its asset-base with moKredit, it had little visibility as to moKredit's ability to return capital when/if needed to, among other things, maintain an effective hedging position. Cred had, in fact, almost no information respecting moKredit's loan portfolio at any given point in time. When the 'flash crash' of March 2020 caused a liquidity crisis for Cred, Cred had to repatriate substantial capital from moKredit, but moKredit was not positioned to return any capital. Cred's hedge positions fell away, rendering it 'naked' to future swings in cryptocurrency trading prices." *Id.*  Again, Uphold failed to disclose this material information.

43. In addition to its shady relationship with moKredit, Cred vested considerable corporate authority in James Alexander, its Chief Capital Officer. Mr. Alexander was convicted on December 3, 2007, in the United Kingdom for crimes related to illegal money transfers, for which he was sentenced to three years and four months in prison to be served at HMP Ford

Prison in West Sussex, England. At the time of his incarceration, there was a prison break at this facility. Mr. Alexander has been identified by the UK government as a fugitive.  Examiner Rpt. at 7.

44.     In or around June 2020, Mr. Alexander, was terminated.  At or around this time, balance sheet discrepancies at Cred became apparent, including the absence of $3 million worth of Bitcoin that had been earmarked to help Cred rectify its hedging strategy.

45.     On or around November 7, 2020, Cred filed for bankruptcy.

## IV.     Uphold Knew or Should Have Known the Problems at Cred, and Systematically Failed to Disclose Them, Instead Actively Marketing its "Earn" Program Until October 2020.

### A.     Uphold's Superior Knowledge Relative to Consumers.

46.     The facts summarized in Section III above were or should have been known to Uphold.

47.     First, pursuant to a partnership agreement entered in early 2019 between Uphold and Cred, Uphold acquired the marketing rights for, and provided Uphold users with predominant (and, upon information and belief, in late 2020, possibly exclusive) access to, the investments in Cred (through Uphold's "Earn" program).  Throughout 2019, Uphold was a primary source for customer leads for Cred.  Examiner Rpt. at 19.

48.     Second, Mr. Schatt, Cred's CEO, who also served as one of its only two Board Members and Director of Operations (in fact, the person solely responsible for operations) also served as a Director on Uphold's (small) Board.

49.     Third, Uphold assisted in Cred's operations.  Examiner Rpt. at 19, 36.

50.     Fourth, Uphold acted as Cred's custodial wallet, which, in combination with the other factors, is also relevant.  Uphold, in other words, was the third party provider of storage

and security services for cryptocurrencies invested in Cred.  The "private keys" to the cryptocurrency were thus held by Uphold, which had full control over the funds.

51.     Thus, Uphold had superior knowledge relative to its consumers as to the true nature of Cred, and the true nature of the "Earn" product.  It thus had an obligation to disclose these facts.

52.     However, at no time during the pendency of  the "Earn" program did Uphold disclose the true facts about Cred's egregious mismanagement.  To the contrary, Uphold made partial representations conflating Cred with Uphold itself, and touting its general safety.

**B.     Uphold's Partial Representations.**

53.     Uphold systematically treated the "Earn" program as one connected to its own stablecoin, the Universal Dollar, and more generally as part of the family of its own products.[1] Its partial misleading representations are a further and alternative basis on which Uphold had an obligation to inform its consumer customers of the truth, and not hide it.

54.     In each of its various marketing materials relating to its Universal Dollar, Uphold provided prominent icon boxes labeled "Earn" or "Start Earning" for customers to click and provide information on how much they wanted to invest in Uphold Earn, using their Universal Dollars.  Uphold already had access to the funds from the customers in its system, in customers' virtual wallets.

55.     For example, in or around October 12, 2018, Uphold tweeted to users a $500k Universal Dollars giveaway and encouraged Uphold users to "be first to earn interest on digital assets!"

---

[1] Uphold emphasized the safety of its own Universal Dollar.  In a March 8, 2019 release, featured on Uphold's website, Uphold represented that its Universal Dollar (UPUSD) was "pegged on a 1:1 ratio to the U.S. Dollar. . . . UPUSD is 100% backed with the U.S. dollar.  U.S. dollars are held at banks located in the United States with the intention of being eligible for FDIC 'pass-through' deposit insurance, subject to applicable limitations."



56.     In Uphold's marketing, it used slight variations on the same nomenclature to describe Uphold Earn, often simply calling it "Earn," other times "Cred Earn."  However, irrespective of which iteration of "Earn" Uphold used, the Earn-related investment was presented as part of Uphold.

57.     Illustrative examples of Uphold's marketing to consumers include:

a.      A February 3, 2020, Uphold tweet that "#CredEarn has been available on Uphold for a year, so it's time to celebrate!  We're proud to partner with @ihaveCred to give Uphold users access to earn interest on" various financial products.

b.      On April 29, 2020, Uphold tweeted that users of CredEarn could "earn up to 10% on #crypto, national currencies, #stablecoins and gold" and that consumers can "Spend what you've earned with the #Uphold Card."

c.      An  Uphold mass email to consumers asked "[d]o you like earning interest on the dollars you hold?  Well, we have good news! Cred currently offers Uphold customers highly competitive rates on US dollars, up to 12%

-12-

APY.  Log into your CredEarn dashboard and take advantage now." At the bottom of the email, consistent with its practice, Uphold provided a blue icon box labeled "Start earning" for Plaintiffs and other consumers to click on and enroll in this offer.

d.     A Fall 2020 Uphold mass email to consumers promoting its "Earn" program for Universal Dollar holders, claiming it provided "highly competitive rates on USDC, USDT, and UPUSD to Uphold customers." Uphold represented that, "[w]hile returns are offered by traditional banks still sit near zero, these stablecoins are available at interest rates up to 12% for USDC and USDT, and up to 13% for UPUSD."  Uphold represented that "[t]hese rates apply to any member who has committed to a program from October 1, 2020, and will last until 5 PM PST on October 14, 2020. Log into your CredEarn dashboard now to take advantage of this promotion!"  At the bottom of the email, consistent with its practice, Uphold provided a blue icon box labeled "Start earning" for consumers to click on to enroll in this offer.

58.     Indeed, whenever a customer bought cryptocurrency on Uphold, Uphold would display an advertisement to the customer promoting Earn as a way to earn interest on their cryptocurrency.  Examiner Rpt. at  33.

59.     Other ways in which Uphold presented "Earn" as an Uphold product—in addition to the representation to consumers that they could "opt[] in" to earn on an investment in Uphold's Universal Dollar, and the "Earn" option button as part of the marketing of the Uphold Universal Dollar—involve the overall look and consumers experience on the Uphold website.

-13-

60.     When Uphold consumers transacted on Uphold, Uphold displayed an internet banner advertisement representing that its "Earn" or "Cred Earn" program allowed Uphold customers to earn interest.  When Uphold consumers checked their investments in the Uphold wallet, there was an "Earn" dashboard under which the status and value of their interest earning investments were provided.

61.     At no time during the pendency of the "Earn" program did Uphold disclose that the "Earn" program was simply an investment in Cred.

62.     Moreover, Cred retained the discretion to invest funds it obtained from Uphold customers as it saw fit by, *inter alia*, lending it to moKredit and gamers in China.    Examiner Rpt. at 37. Uphold failed to disclose this material information to its customers when promoting the Earn product.

### C.     Uphold Even Continued to Market "Earn" Through October 2020, Before Discontinuing It.

63.     Finally, as further reflection of Uphold's fraud, it continued to market "Earn" products even as Cred collapsed.

64.     Specifically, Uphold continued to promote the "Earn" product heavily on its platform, on Twitter, and via direct (albeit uniform) emails to Uphold users through September 2020, and continued to provide Uphold customers with a link to "start earning."

65.     It was not until on or around October 23, 2020, that Uphold discontinued "Earn" consumer access for withdrawal of funds via its online platform and notified consumers of this via email.

66.     If consumers sought more information, Uphold similarly failed to disclose the true facts, representing only that the program was discontinued for commercial reasons.

-14-

67.     Following the notification, consumers could no longer view their "Earn" balance on the Uphold platform.

68.     Following the Cred bankruptcy filing, Uphold posted on its platform "Cred: An open letter to affected users from Uphold's CEO."  In this letter, Uphold's CEO stated, misleadingly, that Uphold was not aware of any of  the numerous and pervasive financial irregularities at Cred. until October 23, 2020, at 11:45 am (EDT) when it was contacted by a journalist looking to corroborate a story about Cred "losing several million in client funds." Uphold stated that in response it "immediately organized a call with Cred's senior management to find out what the journalist was referring to and how best to proceed."  Uphold then allegedly "learned from Cred that there were indeed financial issues affecting their balance sheet," and "blocked deposited into cred but not withdrawals from Cred) in order to protect Uphold customers" and terminated its relationship with Cred.

## V.     Uphold's Purported Disclaimers Are Inadequate and Unenforceable.

69.     Uphold has purported to insulate itself from liability from the extensive losses its customers have suffered due to Cred's failure and bankruptcy.  Its disclaimers are unenforceable and inadequate, based on their terms, the entire transaction, and Uphold's own obligations given its knowledge.

70.     When consumers enrolled in the "Earn" program, Uphold allegedly provided a disclaimer as it funneled users  to the Cred website.  The only way for Plaintiffs to access the Cred website was through the Uphold wallet.  The Cred website itself displayed "Total Uphold Assets" in the upper right-hand corner.  Thus, despite the disclaimer, the two websites were integrated and/or appeared to be integrated to Plaintiffs and other consumers.

71.      In its disclaimer, Uphold represented in non-emphasized 'small print' that it was not responsible for the products, services and content of the Cred website, that Uphold will "have

no liability for any transaction initiated by you with or through Cred LLC" and that Uphold "may act based on certain instructions through Cred LLC but shall have no responsibility for the accuracy, completeness or timing of instructions it receives on your behalf."

72.     This disclaimer, however, was inapplicable or unenforceable.

73.     First, it stated that "[t]he CredEarn Program is offered solely by Cred LLC to Non-U.S. Persons."  Thus, a reasonable U.S. resident consumer, if they even attempted to reconcile the disclaimer with Uphold's other statements and omissions, would believe that it involved something separate and inapplicable to what they were doing (investing in the "Earn" program).

74.     Second, under applicable law, the disclaimer is not exculpatory for Uphold's knowing fraud.

75.     Third, due to the conflation of Uphold Earn with Cred, in the context of the overall transaction, all this language was likely to deceive and confuse a reasonable consumer. Uphold offered substantial assistance to consumers in enrolling in the "Earn" program, thus rendering statements to the contrary, like the statement about non-U.S. persons, irreconcilable with the facts.

## VI.    Plaintiffs' Illustrative Experiences.

76.     **Addison Sandoval:**  Plaintiff Sandoval created an Uphold online account on March 4, 2020 and enrolled in "Earn" in July 2020.  Plaintiff Sandoval relied on Uphold's uniform material omissions and partial representations as set forth above

77.     Plaintiff Sandoval made an initial investment of $5,000 in the Uphold Earn via his Uphold Wallet on July 1, 2020.  Uphold encouraged Plaintiff to "earn" 10% annually, with a six-month term, on the investments in his Uphold wallet.  Uphold provided Plaintiff with a debit

card to make investments and to access his funds in his Uphold Wallet.  Plaintiff Sandoval linked his Uphold Wallet to his conventional bank account.

78.     Plaintiff Sandoval invested a total of $45,411, which was converted to Universal Dollars and enrolled in the Earn program through his Uphold wallet.  Plaintiff believed his investments with Uphold and the Earn program in Universal Dollars were secure, interest earning, and readily accessible upon maturation at the end of the six-month term for his own use. Plaintiff Sandoval made the following investments via the Uphold platform and CredEarn dashboard via his Uphold wallet:

|     | Date Invested | Amount Invested | Guaranteed Return | Term/Reversion |
| --- | --- | --- | --- | --- |
| 1. | July 1, 2020 | $5,000 | 10% per annum | 6 months |
| 2. | July 14, 2020 | $2,500 | 10% per annum | 6 months |
| 3. | July 24, 2020 | $7,494 | 10% per annum | 6 months |
| 4. | August 11, 2020 | $2,509 | 10% per annum | 6 months |
| 5. | August 14, 2020 | $2,500 | 10% per annum | 6 months |
| 6. | August 24, 2020 | $2,500 | 10% per annum | 6 months |
| 7. | September 9, 2020 | $4,907 | 10% per annum | 6 months |
| 8. | September 12, 2020 | $5,000 | 10% per annum | 6 months |
| 9. | September 30, 2020 | $5,000 | 10% per annum | 6 months |
| 10. | October 10, 2020 | $5,001 | 13% per annum | 6 months |
| 11. | October 12, 2020 | $3,000 | 13% per annum | 6 months |
|     | Totals | $45,411 | $2,366 | $47,777 |

79.     Once informed by Uphold in October of the termination of Uphold Earn, Plaintiff contacted his bank that was linked to his Uphold Wallet in order to secure his investments with Uphold.  Although Plaintiff's bank opened an investigation, it was only able to issue Plaintiff a provisional credit of $10,000.00.

80.     On December 3, 2020, Uphold shut down Plaintiff Sandoval's account, sending him an email stating:

> We're very sorry to tell you that we can no longer offer you an account.  As a regulated business, sometimes we have to make difficult decisions like this as new information becomes available. Don't worry, your funds are safe and we'll be in touch shortly about handling any available balance.

81.     This statement was materially false and misleading because Uphold knew, and failed to disclose, that Plaintiff Sandoval's funds were not safe and most likely were lost as a result of the problems with Cred.  At or around this same time, Plaintiff Sandoval was suspended from the Uphold Platform without reason or justification.  Uphold soon informed Plaintiff Sandoval that his Uphold account was closed.

82.     Plaintiff Sandoval made numerous complaints to Uphold's customer service team online via the TrustPilot platform concerning his inability to access and withdraw his investments.  Plaintiff Sandoval repeatedly has requested that Uphold refund his investments to no avail.

83.     On December 29, 2020, Plaintiff Sandoval provided written notice to Uphold as required by the California Consumer Legal Remedies Act and again requested a refund of his money.

84.     On February 25, 2021, Plaintiff Sandoval filed a complaint in the Superior Court of the State of California, County of Los Angeles against Uphold, asserting claims under California law.

-18-

85.     On July 20, 2021, the Superior Court of the State of California granted Uphold's motion to stay or dismiss the action on the grounds of inconvenient forum based on the mandatory forum selection clause in the Uphold User Agreement.  That Agreement designated exclusive jurisdiction to New York courts for disputes arising out of the Agreement.

86.     Had Plaintiff Sandoval known the truth about the "Earn" program, he would not have invested in it.

87.     **Lionel Ducote:** Plaintiff Ducote created an Uphold online account on or around October 10, 2019, and on or around Oct. 8, 2020, he enrolled in the "Earn" program via his Uphold wallet. Plaintiff Ducote relied on Uphold's uniform material omissions and partial representations as  set forth above when enrolling in Earn.

88.     Plaintiff Ducote invested more than $13,000 in USD and cryptocurrencies in the "Earn" program via his Uphold wallet and has been denied access by Uphold to these investments.

89.     Had Plaintiff Ducote known the truth about the "Earn" program, he would not have invested in it.

90.     **Richard Neal:** Plaintiff Neal created an Uphold online account on September 18, 2019, and enrolled in the "Earn" program on February 22, 2020.  Plaintiff Neal relied on Uphold's uniform material omissions and partial representations as set forth above.

91.     . On February 29, 2020, Plaintiff Neal invested thousands of dollars' worth of cryptocurrencies, including 132,393.08217899 XRP and .10655155 Bitcoin, in the "Earn" program via his Uphold wallet.  On March 3, 2020, Plaintiff Neal invested additional cryptocurrency (10,000 LBA) in the "Earn" program via his Uphold wallet.  The approximate

-19-

value of these cryptocurrencies at the time of Plaintiff Neal's investments in Earn was in excess of $95,000.00.

92.     In September 2020, Plaintiff Neal requested to Uphold that his funds not be reinvested in the Earn product.  Uphold did not honor his request.  Later that fall, Plaintiff Neal was made aware that Uphold had discontinued the Earn program.  Plaintiff Neal was unable to access his investments in the Earn program.   Had Plaintiff Neal known the truth about the "Earn" program, he would not have invested in it.

93.     **Nicholas King**:  Plaintiff King created an Uphold online account on July 29, 2020 and enrolled in the "Earn" program.  Plaintiff King relied on Uphold's uniform material omissions and partial representations as set forth above.

94.     Plaintiff King invested approximately $6,400 of cryptocurrency in the "Earn" program on September 1, 2020 (investing cryptocurrency valued then at approximately $2,181.33) and on September 15, 2020 (investing cryptocurrency valued then at approximately $4,218.05).[2]

95.     In early November 2020, Plaintiff King checked the balance of his investments in his Uphold wallet.  He was shocked to learn that Uphold had discontinued the program abruptly, and he was not able to access his investments in Earn.

96.     Had Plaintiff King known the truth about the "Earn" program, he would not have invested in it.

97.     **Other Consumers:** The experiences of other consumers were in accord with those of the Plaintiffs.

---

[2] The current value of these cryptocurrencies in U.S. dollars is materially greater.

98.     As one Uphold user wrote, "Uphold ran ads for CredEarn.  Initially, I believed that CredEarn was the name of Uphold's interest earning program.  However, it turned out that an associated, but separate company called Cred offered a program called Earn.  Together that's CredEarn.  And Uphold ran ads for them and kind of integrated their platform and Cred's."  See https://read.cash/@MoreGainStrategies/crypto-lending-news-uphold-has-just-broken-up-with-credearn-87180364.

99.     Another Uphold user wrote, "I initially believed that CredEarn was a program by Uphold itself."  See https://www.pulish0x. com/crypto-stocks-and-stuff/crypto-lending-disaster-cred-filed-chapter-11-bankruptcy-xnlmpv.

100.    Likewise, Uphold has denied other Class members the opportunity to access and transfer funds off the Uphold Platform.

101.    On August 11, 2020, an Uphold customer wrote on https://www.g2.com/products/uphold/reviews that Uphold "Shut down my account without telling me why" and that Uphold "said my account was flagged for review and just shut it down and closed my account without telling me why."  On January 4, 2021, another Uphold customer complained:

> I deposited Ethereum with them [Uphold] and haven't since been able to move it to another external wallet. I can't sell it and withdraw to my bank account or even send it back to my Coinbase wallet.
>
> It's simply locked and when I reached out to support, they said they're doing checks on my account and in the meantime feel free to exchange it for another currency (with a $38 fee!!!!).
>
> Their app isn't usable on an iPhone. It's filled with bugs and the UX is awful.
>
> The website is so confusing. They've tried way too hard trying to build a tricky flash site and it simply doesn't work.

I'm not sure what I dislike more, their products or the company itself.

I just want my money and it seems to have been lost in the ether with no warnings that my account would be locked while it's being verified before I deposited the assets.

It's now been more than a month. They never refunded me my $4,000 worth of Ethereum and now they don't even write back. What's worse is they have deleted my account, so now I can't even see my funds.

This company is a total scam. Don't go near them.

102.    On March 28, 2021, another customer posted on

https://www.g2.com/products/uphold/reviews :

"Blocks access to funds"

I have only used the platform for a few months but Uphold has blocked my account, preventing me from withdrawing my funds. It has been more than 3 weeks, and they will not even respond to my requests for an update.

103.    On April 22, 2021, another customer wrote about Uphold on

https://www.g2.com/products/uphold/reviews, stating:

"Fraud. Stay away!"

Our company has deposited a first amount (roughly 40K euro) to be invested into stocks and shares via Uphold.

Since more than 2 months the money are lost, and customer care agents are replying with standardized messages, saying that they are doing their best to help (to help on what??!)

Our lawyer is considering filing the lawsuit now. This is the worst ever experience I've had throughout 10+ years of business experience.

2317533.3

## CLASS ACTION ALLEGATIONS

104.    Plaintiffs bring their action pursuant to Federal Rule of Civil Procedure, Rule

23(a), 23(b)(2), (b)(3), and (g) on behalf of a Class defined as follows:

> All persons who have or had an Uphold account and who, during
> the period from March 1, 2020 onward, enrolled in, or maintained
> previously-invested money in, the Uphold Earn product via the
> Uphold wallet.

105.    Excluded from the class are Uphold, its offers and directors and members of their

immediate families, and the judge to whom this case is assigned.

106.    Plaintiffs reserve the right to modify or amend the definition of the Class

before the Court determines whether certification is appropriate.

107.    **Numerosity:** The proposed Class is so numerous that joinder of all members

would be impracticable.  Uphold has more than seven million customers and upon information

and belief thousands, or tens of thousands, of Uphold customers invested in the "Earn" product

via their Uphold wallet.  The individual Class members are ascertainable, as the names and

addresses of all class members can be identified in the business records maintained by Uphold.

The precise number of Class members can be obtained through discovery, but the numbers are

clearly more than can be consolidated in one complaint such that it would be impractical for each

member to bring suit individually.  Plaintiffs do not anticipate any difficulties in the management

of the action as a class action, in particular given Uphold's choice to have all claims subject to

New York Law.

108.    **Commonality:** There are questions of law and fact that are common to

Plaintiffs' and Class members' claims.  These common questions predominate over any

questions that go particularly to any individual member of the Class.  Among such common

questions of law and fact are the following:

a.   whether Uphold had a duty to disclose the true facts about the "Earn" product;

b.   whether Uphold's nondisclosures and partial disclosures about the "Earn" product were misleading and deceptive;

c.   the time at which Uphold came to have actual knowledge of the true facts;

d.   how Uphold was enriched and benefitted from its conduct and whether that enrichment was unjust;

e.   whether New York law applies to the claims of the Class;

f.   whether any disclaimer is unenforceable;

g.   whether Plaintiffs and the Class have suffered damages as a result of Defendant's actions and the amount thereof; and

h.   The appropriate remedies to be imposed on Defendant for violation of the laws claimed herein;

109.   **Typicality:** Plaintiffs are members of the Class they seek to represent.  Like other Class members, they invested in the "Earn" product under false pretenses, and lost money. Plaintiffs' claims are typical of claims of the other class members because of the similarity, uniformity, and common purpose of Uphold's unlawful conduct.  Each Class member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs due to Uphold's unlawful conduct.

110.   **Adequacy of Representation and Counsel:** Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class. Plaintiffs are committed to the vigorous prosecution of this action and have retained competent

-24-

counsel, experienced in consumer and class action litigation of this nature, to represent them. There are not conflicts between Plaintiffs and the unnamed Class members.

111.    **Predominance and Superiority:** The questions of law or fact common to Plaintiffs and each Class Member's claims predominate over any questions of law or fact affecting only individual members of the class.  All claims by Plaintiffs and the unnamed Class members are based on Uphold's materially false and misleading statements and omissions concerning the "Earn" product.

112.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even though some individualized damages determinations may be necessary.

113.    As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Class as is the case at bar, common questions will be held to predominate over individual questions.

114.    A class action is superior to individual actions.

115.    Joinder of all Class members would create extreme hardship and inconvenience for the affected borrowers as they are dispersed geographically and reside across multiple states.

116.    Individual claims by Class members are impractical because the costs to pursue individual claims exceed the value of what any one Class member has at stake.  As a result, individual Class members have no interest in prosecuting and controlling separate actions.

117.    The interests of justice are well served by resolving the common disputes of potential Class members in one forum.  Individual suits would not be cost effective or economically maintainable, and the action is manageable as a class action.

118.    Thus, certification under Rule 23(b)(3) is appropriate.

119.   **Cohesiveness:** Prosecuting separate actions by or against individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the class.

120.   Uphold has acted or failed to act in a manner generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

121.   Thus, certification under Rule 23(b)(2) is appropriate.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEFNEW YORK GENERL BUSINESS LAW,  §349

122.   Plaintiffs repeat and reallege each preceding paragraph of the Complaint as if fully set forth herein.

123.   Plaintiffs and the other members of the Class are "persons" and members of the consuming public within the meaning of GBL §349(h).

124.   GBL §349(a) states: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

125.   Uphold's acts and practices alleged herein took place within New York and constitute acts, uses, or employment of deception, fraud, unconscionable and unfair commercial practices, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of merchandise, and with the subsequent performance, of Uphold in violation of § 349 of New York's General Business Law, making deceptive and unfair acts and practices illegal.

-26-

126.    Uphold's conduct is deceptive because its material omissions and partial representations were likely to mislead consumers and the public, including Plaintiffs and the other members of the Class.

127.    Uphold failed to disclose the true facts about its "Earn" program, at a benefit to itself and the detriment of the Class, despite its obligation to disclose due to its superior knowledge and the false and misleading partial representations it made, including as to Earn's sponsorship and safety.

128.    The deceptive acts and practices of Defendant have directly, foreseeably, and proximately caused damages and injury to Plaintiffs and the Class.  Indeed, Defendant's false and deceptive representations caused Plaintiffs and the Class to suffer damages, including investing thousands of dollars with Earn, which Plaintiffs cannot access or withdraw. Plaintiffs and the Class would not have invested in the "Earn" product had Uphold disclosed the true facts about Cred, which Uphold knew or reasonably should have known at all relevant times and no later than March 2020.

129.    In addition to pecuniary losses, Plaintiffs have suffered actual harm as a result of Defendant's violations GBL §349(a), including but not limited to, the annoyance, harassment, time, frustration, and anger due to Defendant's violations of GBL §349.

130.    Plaintiffs and the Class are entitled to pursue claims against Defendant for damages, statutory damages, treble damages, exemplary damages, injunctive relief, costs and attorney's fees pursuant to GBL §349(h) to redress Defendant's violations of GBL §349(a).

131.    Plaintiffs and the Class have no adequate remedy of law.

## SECOND CLAIM FOR RELIEF
## VIOLATIONS OF STATE CONSUMER PROTECTION LAWS IN ADDITION TO NEW YORK

132.     Plaintiffs repeat and reallege each preceding paragraph of the Complaint as if fully set forth herein.

133.     This claim is brought in the alternative to the first claim for relief. To the extent the Court determines that, notwithstanding the Terms and Conditions and the fact that Uphold's fraudulent scheme was hatched and implemented in New York, the laws of other states, including, but not limited to, California and Arizona, likewise protect against consumer fraud of this nature, Plaintiffs plead claims on behalf of themselves and the Class for the similar violations by Defendant of those state statutes that protect consumers for unfair, deceptive, misleading and/or unconscionable acts, practices and conduct, whether in the form of misrepresentations or omissions, including the following:

(a).     The Alaska Unfair Trade Practices and Consumer Protection Act, Alaska State. §§ 45.50.471 *et seq.*;

(b).     The Arizona Consumer Fraud Act, Ariz. Rev. Stat. Ann. §§ 44-1521, et seq.;

(c).     The Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §§ 4-88-101, *et seq.*;

(d).     The California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* and/or the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

(e).     The Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-101, *et seq.*;

(f).     The Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, *et seq.*;

(g).     The Delaware Consumer Fraud Act, Del. Code Ann. tit. 6, §§2511 et seq. and/or the Delaware Uniform Deceptive Trade Practices Act, Del. Code Ann. tit. 6, §2531, *et seq.*;

(h).     The District of Columbia Consumer Protection Procedures Act, D.C. Code Ann. §28-3901, *et seq.*;

-28-

(i).     The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. §§ 501.201, *et seq.*;

(j).     The Georgia Uniform Deceptive Trade Practices Act, Ga. Code Ann. §§ 10-1-370, *et seq.*;

(k).     The Hawaii Uniform Deceptive Trade Practices Act, Haw. Rev. Stat. §§ 481A-1, *et seq.* and/or Hawaii Rev. Stat. §§ 480-1, *et seq.*;

(l).     The Idaho Consumer Protection Act, Idaho Code §§ 48-601, *et seq.*;

(m).     The Illinois Consumer Fraud and Deceptive Business Practices Act, Ill. Comp. Stat. Ann. §§ 505/1 *et seq.*;

(n).     The Indiana Deceptive Consumer Sales Act, Ind. Code Ann. §§ 24-5-0.5-1, *et seq.*;

(o).     The Kansas Consumer Protection Act, Kan. Stat. Ann. §§ 50-623, *et seq.*;

(p).     The Kentucky Consumer Protection Act, Ky. Rev. Stat. §§ 367.110, *et seq*;

(q).     The Maine Unfair Trade Practices Act, Me. Rev. Stat. Ann. tit. 5, §§ 205A, *et seq.*;

(r).     The Maryland Consumer Protection Act, Md. Com. Law. Code Ann. §§ 13-101, *et seq.*;

(s).     The Massachusetts Regulation of Business Practice and Consumer Protection Act, Mass. Gen. Laws Ann. Ch. 93A;

(t).     The Michigan Consumer Protection Act, Mich. Comp. Laws Ann §§ 445-901, *et seq.*;

(u).     The Minnesota Prevention of Consumer Fraud Act, Minn. Stat. Ann. §§ 325F.68, *et seq.*;

(v).     The Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010, *et seq.*;

(w).     The Nebraska Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601, *et seq.*;

-29-

(x).     The Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. §§ 598.0903 *et seq*. and/or Nevada Rev. Stat. §41.600;

(y)**.**     The New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann., §§ 358-A:1, *et seq*.;

(z).     The New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq*.

(aa).     The New Mexico Unfair Practices Act, N.M. Stat. Ann., §§ 57-12-1, *et seq*.;

(bb).     North Carolina, N.C. Gen. Stat. §§ 75-1.1, *et seq*.;

(cc).     North Dakota, N.D. Gen. Stat. §§ 51-15-01, *et seq*.;

(dd).     The Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. §§ 1345.01, *et seq*.;

(ee).     The Oklahoma Consumer Protection Act, Okla. Stat. Ann. tit. 15, §§ 751, *et seq*.;

(ff).     The Oregon Unlawful Trade Practices Law, Or. Rev. Stat., §§ 646-605 *et seq*.;

(gg).     The Pennsylvania Unfair Trade Practices and Consumer Protection Law, Pa. Stat. Ann. tit. 73, §§ 201-1, *et seq*.;

(hh).     The Rhode Island Unfair Trade Practices and Consumer Protection Act, R.I. Gen. Law §§ 6-13.1-1, *et seq*.;

(ii).     The South Dakota Deceptive Trade Practices and Consumer Protection Act, S.D. Codified Laws Ann. §§ 37-24-1, *et seq*.;

(jj).     The Texas Deceptive Trade Practices – Consumer Protection Act, Tex. Bus. & Com. Code Ann. §§ 17.41, *et seq.*;

(kk).     The Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451, *et seq*.;

(ll)     The Washington Consumer Protection Act, Wash. Rev. Code §§ 19.86.010, *et seq*.;

(mm)**.**  West Virginia, W.Va. Code §§ 46A-6-101, *et seq*.;

(nn).     Wisconsin, Wisc. Stat. Ann. §100.18; and

-30-

(oo).    The Wyoming Consumer Protection Act, Wyo. Stat. §40-12-101, *et seq*. Plaintiffs possess standing to plead and represent the claims of the Class for violations of the above-referenced state statutes.  *See Langan v. Johnson & Johnson Consumer Cos*., 897 F.3d. 88, 95-96 (2d. Cir. 2018).

134.    By the acts, practices, misrepresentations and/or omissions alleged herein, Defendant violated the above-referenced state consumer protection statutes and Plaintiffs and the Class have suffered damages as a result.

**THIRD CLAIM FOR RELIEF**
**FRAUD/FRAUDULENT CONCEALMENT**

135.    Plaintiffs repeat and reallege each preceding paragraph of the Complaint as if fully set forth herein.

136.    As set forth above, Uphold was under an obligation to disclose the true facts about the Earn program based on its superior knowledge, and/or the partial representations it made.

137.    In addition to the representations that Earn was an Uphold product, Uphold went so far as to claim that Earn functioned like a traditional banking product, when it knew it did not, and suggested specific attractive returns at a time when it knew or should have known there were likely no returns at all.  Uphold also made the representation that interest earning investments in Earn were readily accessible and could be withdrawn upon the maturation date via a debit card Uphold provided to Plaintiffs.

138.    Uphold knew, or reasonably should have known, and failed to disclose that at all relevant times, and no later than March 2020, that Cred, which sponsored Earn, was plagued with pervasive, material financial irregularities.

139.    Uphold continued to make partial representations which it knew or reasonably should have known were false.

140.    Uphold's material omissions and partial representations were made with the intent to induce Plaintiffs and the Class to invest with Earn.  Indeed, Uphold was a primary generator of customers and cryptocurrency infusions for Cred through its widespread promotion of the Earn product to Uphold users.

141.    Plaintiffs and the Class reasonably relied upon the false representations and omissions made by Defendant by making substantial investments in Earn via their Uphold wallets.   Had Plaintiffs and the Class known of Uphold's material omissions and the falsity of its partial representations, Plaintiffs and the Class would not have invested in Earn.

142.    Uphold's omissions were material.

143.    As a direct and proximate result of Plaintiffs' and the other Class members' reliance upon the material omissions and partial representations of Defendant, Plaintiffs and the Class have suffered actual damages.  Because Defendant's conduct alleged herein is willful and wanton, Plaintiffs and the Class are entitled to punitive, as well as actual, damages

### FOURTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT

144.    Plaintiffs repeat and reallege each preceding paragraph of the Complaint as if fully set forth herein.

145.    Defendant has violated the common laws of unjust enrichment under the law of the State of York, which applies here, and alternatively under the laws of all the states of the United States and the District of Columbia.

146.     Defendant has benefited from the unlawful and inequitable acts alleged in this Complaint by encouraging, directing, and enabling Plaintiffs and Class members to enroll in Earn via their Uphold wallets under false pretenses.

147.     Plaintiffs and the Class have conferred upon Defendant a traceable economic benefit resulting from the unlawful and inequitable acts alleged in this Complaint.

148.     The economic benefits derived by Defendant are a direct and proximate result of Defendant's unlawful and inequitable acts alleged in this Complaint. It would be inequitable and unjust for Defendant to retain any portion of the profits, fees, or revenues resulting from Defendant's inequitable and unlawful acts.

149.     Plaintiffs' and Class members' unintentional conferral of benefits or profits onto Defendant were brought about by Defendant's unlawful, unfair, deceptive, misleading and inequitable methods, acts, and practices alleged in this Complaint.

150.     Defendant should be compelled to provide restitution or to disgorge in a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds received from them.

151.     A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendant traceable to Plaintiffs and Class members.

2317533.3

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, pray for judgment against Defendant as follows:

A.      Certification of the Class and any subclasses, appointment of Plaintiffs as the Class Representatives, and the undersigned counsel as Class Counsel;

B.      The award of actual and compensatory damages for injuries suffered by Plaintiffs and the Class;

C.      The award of statutory, exemplary, and/or punitive damages and/or penalties to Plaintiffs and the Class;

D.      The award of restitution to Plaintiffs and the Class;

E.      Reasonable attorney's fees and costs of this action and pre-judgment interest under the state consumer fraud statutes; and

F.      Such other relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable


Dated: December 13, 2021                          **GISKAN SOLOTAROFF & ANDERSON LLP**


                                                  */s/ Catherine E. Anderson*
                                                  Catherine E. Anderson, Esq.
                                                  Email: canderson@gslawny.com
                                                  90 Broad Street, 2nd Floor
                                                  New York, New York 10004
                                                  Telephone: (212) 847-8315

                                                  **LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**

                                                  */s/ Rachel Geman*
                                                  Rachel Geman

250 Hudson Street, 8th Floor
New York, New York  10013-1413
Telephone:  (212) 355-9500

*Attorneys for Plaintiffs and the Proposed Class*