UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                               :

ADDISON SANDOVAL, et al.,         :
                                               :

                       Plaintiffs,    :
                                               :                21-CV-7579 (VSB)

           - against -        :
                                               :               **OPINION & ORDER**

                                               :

UPHOLD HQ INC.,                  :
                                               :

                      Defendant.   :
--------------------------------------------------------X

<u>Appearances</u>:

Rachel Geman
Christopher E. Coleman
Lieff Cabraser Heimann & Bernstein, LLP
New York, New York

Catherine Elizabeth Anderson
Giskan Solotaroff & Anderson, LLP
New York, New York

*Counsel for Plaintiffs*

Benjamin Delalio Bianco
Caitlin R. Trow
Meister Seelig & Fein LLP
New York, New York

*Counsel for Defendant*

<u>VERNON S. BRODERICK, United States District Judge</u>:

       This is a putative consumer class action filed by Plaintiffs Addison Sandoval

("Sandoval"), Lionel Ducote ("Ducote"), Nicholas King ("King"), and Richard Neal ("Neal")

(collectively, "Plaintiffs"), alleging that Defendant Uphold HQ, Inc. ("Uphold") misled

customers like Plaintiffs through various marketing practices that caused Plaintiffs to invest in a

cryptocurrency product that ultimately lost all its value.  Before me is Uphold's motion to dismiss this action pursuant to Federal Rule of Civil Procedure 12(b)(6).  Because I find that Plaintiffs have failed to allege that Uphold engaged in a deceptive practice within the meaning of applicable law, Uphold's motion to dismiss is GRANTED.

## I.    Factual Background[1]

### A.  *Uphold, the "Earn" Product, and Cred*

Uphold is a South Carolina corporation with its "headquarters located at 6 West 18th Street, 3rd Floor, New York, New York 10011."  (FAC ¶ 19.)  Uphold markets itself as a "digital money platform" that allows its customers to "transact in fiat currencies, cryptocurrencies, and precious metals."  (*Id.* ¶¶ 23–24.)  Its "stated goal is to bring cryptocurrency products to the mass consumer market."  (*Id.* ¶ 1.)

In late 2018, Uphold announced it would offer a financial product called "Uphold Earn." (*Id.* ¶ 28.)  Its press releases indicated that the "Earn" product would work in conjunction with what it referred to as a "U.S. Dollar Stablecoin (Universal Dollar), a fully-transparent, digital asset that is backed 1-to-1 with U.S. dollars to be held at U.S. domiciled, FDIC-insured banks." (*Id.* ¶ 29.)[2]  Uphold's 2018 press release stated that Uphold "customers who purchase the

---

[1] The following facts are taken from the well-pleaded allegations found in Plaintiff's First Amended Class Action Complaint (Doc. 12 ("FAC" or "First Amended Complaint")) filed in this action, as well as from documents integral to the FAC.  I assume the well-pleaded factual allegations set forth in the FAC, and in those documents integral to it, to be true for purposes of the motion to dismiss the First Amended Complaint.  *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. . . .  Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." (internal quotations and citations omitted)); *see* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.").  My references to these facts should not be construed as a finding as to their veracity, and I make no such findings.

[2] "A stablecoin is a cryptocurrency whose value is 'pegged' (meaning tied) to another asset—often a traditional fiat currency like the US dollar. . . Stablecoin advocates believe these cryptocurrencies are critical for bridging 'real-world' assets like fiat currencies with digital assets on the blockchain."  *What is a stablecoin?*, Fidelity, https://www.fidelity.com/learning-center/trading-investing/what-is-a-stablecoin (last visited November 2, 2023).

Universal Dollar can opt-in to Uphold Earn, which functions much like a traditional banking product, and can receive attractive and competitive rates, currently as high as five percent." (*Id.* ¶ 30 (emphasis removed).)

Uphold referred to Earn—or some variant of Earn, such as "Start Earning"—in marketing materials that touted Uphold customers would have the option to "earn interest on digital assets," such as in the below marketing image:



(*Id.* ¶¶ 54–55.)  In other marketing materials, Uphold referred to Earn as "#CredEarn" and stated that it was "proud to partner with @ihaveCred to give Uphold users access to earn interest" on their cryptocurrency holdings. (*Id.* ¶ 57(a).)

The Earn product was itself an investment instrument offered through Cred Inc. ("Cred"), a company separate from Uphold that is now in Chapter 11 bankruptcy. (*Id.* ¶ 32; *see also* ¶ 35 (referring to filings in Cred's bankruptcy).)  According to the report of the examiner appointed in Cred's bankruptcy, "Cred was a cryptocurrency financial services platform that offered holders of cryptocurrencies the option of investing those assets with Cred (through the 'CredEarn'

program) or borrowing against those cryptocurrencies (through the 'CredBorrow' program.)."
(Examiner's Report 3.)[3]  "Those participating in CredEarn agreed to invest their cryptocurrency
with Cred for a finite period of time, during which Cred guaranteed those customers a
predetermined rate of return."  *Id*.  CredEarn was thus "similar to a certificate of deposit."  (*Id.* at
26–27.)  Once a cryptocurrency holder loaned funds to Cred through the CredEarn product,
"Cred would then convert [the] cryptocurrency assets . . . into fiat currency and use the proceeds
to make loans."  (*Id.* at 27.)  "Cred would generate profits based on the spread between the
interest rate offered to customers and the rate charged by Cred under the relevant loans."  (*Id.*)

From the perspective of an Uphold user, upon purchasing "cryptocurrency on Uphold,
Uphold would display an advertisement referencing its partnership with Cred and representing
that Cred products allowed Uphold customers to earn interest on their assets."  (*Id.* at 33; FAC ¶
58 (citing Examiner Report 33).)  Uphold also directed its customers to Earn by featuring "an
'Earn' dashboard" within a customer's digital "wallet" on Uphold's website and app, which
showed "the status and value of [a customer's] interest earning investments."  (FAC ¶ 60.)

Prior to being transferred to "the Cred website," "Uphold . . . provided a disclaimer" to
customers.  (*Id.* ¶ 70.)  The disclaimer stated, among other things,

> You are leaving Uphold and going to a third-party site . . . .  Uphold and its affiliates
> are not responsible for the products, services, and content on the third-party
> website.  Any agreement you enter into with CRED LLC will not amend, replace
> or supersede any existing agreement(s) with Uphold that you may have.

(Anderson Decl. Ex. 3.)[4]  The disclaimer also stated that that "the CredEarn Program is
offered solely by Cred LLC to Non-U.S. Persons."  (*Id.*; *see also* FAC ¶ 73.)  The

---

[3] "Examiner's Report" refers to the Report of Robert J. Stark, Examiner, filed in Cred's bankruptcy.  *In re Cred Inc.*,
Case No. 20-12836 (JTD), Doc. 605 (D. Del. Mar. 8, 2021).

[4] "Anderson Decl." refers to the Declaration of Mark G. Anderson in Support of Defendant's Motion to Dismiss,

disclaimer appeared as a separate notice and warning on Uphold's website—to proceed to

Cred's website and to buy into Earn, customers first had to click a continue button at the

bottom of the disclaimer:



(*Id.*)[5]

---

(Doc. 16), and the exhibits attached thereto, all of which were referenced or quoted in Plaintiff's pleadings. (*Compare* FAC ¶ 133 (referring to the legal efficacy of a choice of law clause in Uphold's "Terms and Conditions") *with* Anderson Decl. Ex. 1; *compare* FAC ¶ 20 (quoting "Uphold's User Agreement") *with* Anderson Decl. Ex. 2; *compare* FAC ¶ 71 (quoting the disclaimer) *with* Anderson Decl. Ex. 3.)  Plaintiffs also attached Uphold's General Terms and Conditions, dated January 28, 2020, as Exhibit A to their original Complaint filed in this action.  (Doc. 1-1.)  (*Cf.* Anderson Decl. Ex. 1 (General Terms and Conditions dated January 28, 2020).)

[5] Uphold's Terms and Conditions state "We may partner with other third-party service providers to offer users different funding options and financial instruments ('Third-Party Programs').  By registering for and/or using any Third-Party Programs, you expressly agree that you have read, understand and accept all the applicable terms and conditions that may apply."  (Anderson Decl. Ex. 1 § 3.4.)

Once on the Cred website, Uphold users would see "displayed 'Total Uphold Assets' in the upper right-hand corner."  (FAC ¶ 70.)[6]

**B.  *Uphold Discontinues Access to Earn and Cred Files for Bankruptcy***

On or around October 23, 2020, Uphold removed the ability for its customers to access Earn, including its customers' ability to withdraw Earn funds; that same day it also sent its customers an email about Earn's discontinuation.  (*Id.* ¶ 65.)  After Cred filed for bankruptcy, Uphold published a document entitled "Cred:  An open letter to affected users from Uphold's CEO."  (*Id.* ¶ 68.)  In this letter, Uphold stated that it was not aware of any "financial irregularities at Cred until October 23, 2020, at 11:45 am (EDT) when it was contacted by a journalist looking to corroborate a story about Cred 'losing several million in client funds.'"  (*Id.*)  Cred filed its Chapter 11 bankruptcy petition on November 7, 2020.  *In re Cred Inc.*, Case No. 20-12736 (JTD), Doc. 1 (D. Del. Nov. 7, 2020).

According to the Examiner's Report from Cred's bankruptcy, Cred failed during the "'flash crash' in cryptocurrency trading value" that came in March of 2020, which in turn caused a liquidity crisis.  (Examiner's Report 3.)[7]  In the Examiner's view, "Cred's corporate managers did not run the business to effectively counterbalance [the] risk" of "[s]wings in cryptocurrency trading value" and engaged in a "dereliction" of proper management.  (*Id.* at 3–4.)

Cred's CEO, Daniel Schatt, was one of Uphold's board members and Cred's "sole director . . . in charge of all operational issues."  (FAC ¶¶ 33–34, 48.)  "For Cred, Uphold assisted with operations and acted as its customer wallet."  (Examiner's Report 32.)  "Uphold

---

[6] This is the only allegation Plaintiffs plead about the user experience on the Cred website.

[7] In explaining what precipitated Cred's bankruptcy, the Examiner's Report sets forth more details, including that Cred was heavily invested with a Chinese microlender called "moKredit," which was owned by Cred's co-founder and 50% owner Lu Hua.  (Examiner's Report 6.)  After the flash crash, "Cred had to repatriate substantial capital from moKredit, but moKredit was not positioned to return any capital."  (*Id.*)

was a customer generator for Cred . . . ."  (*Id.* at 33.)  "Under the customer agreements furnished

to the Examiner, Cred retained the discretion to invest funds obtained from Uphold customers as

it saw fit (no differently than any other CredEarn customer)."  (*Id.*)

On or about October 23, 2020, Uphold customers who had bought into Earn became

unable to access their Earn balance on the Uphold platform.  (FAC ¶¶ 65, 67.)  This affected

Plaintiffs financially.[8]  For example, Sandoval made investments totaling $45,411 into Earn

through his Uphold wallet—with money initially wired from his bank account—from July 1,

2020 to October 12, 2020.  (*Id.* ¶¶ 77–78.)  Each of Sandoval's Earn investments—which were

made in amounts ranging from $2,500 to $7,494—were for six-month periods and at a

"guaranteed" rate of return of either 10% or 13% per year.  (*Id.* ¶ 78.)  In October of 2020, once

Sandoval learned that Earn was discontinued, he contacted his bank, which "issu[ed]" him a

"provisional credit of $10,000."  (*Id.* ¶ 79.)  On December 3, 2020, Uphold closed Sandoval's

account and sent him an email stating, among other things, "Don't worry, your funds are safe

and we'll be in touch shortly about handling any available balance."  (*Id.* ¶ 80.)  Shortly

thereafter, Sandoval was suspended from using Uphold.  (*Id.* ¶ 81.)

Sandoval sought legal remedy from Uphold under a California consumer protection law

by filing suit in the Superior Court of the State of California.  (*Id.* ¶¶ 83–84.)  This suit was

ultimately dismissed on the grounds that Uphold's User Agreement required suit to be brought in

New York.  (*Id.* ¶ 85; Anderson Decl. Ex. 2 § 5.7 ("You agree that the laws of the State of New

York, without regard to principles of conflict of laws, govern this Agreement and any claim or

dispute between you and us except to the extent governed by U.S. federal law.  You consent and

---

[8] Each Plaintiff's individual investments in the Earn product are pled in the FAC.  (*See* FAC ¶¶ 76–96.)

submit to the exclusive jurisdiction of the courts (state and federal) located in the State of New York, County of New York in connection with any dispute or controversy arising under or related to this Agreement, the Terms and Conditions or the subject matter hereof or thereof.").)

## II.     **Procedural History**

Plaintiffs filed their original complaint in this action on September 10, 2021.  (Doc. 1.) Following entry of a stipulation and order setting forth a schedule, (Doc. 11), on December 13, 2021, Plaintiffs filed the FAC, (Doc. 12), and on January 14, 2022, Uphold moved to dismiss the FAC by filing a motion, (Doc. 14), declarations and exhibits, (Doc. 15-16), and memorandum of law, (Doc. 17).  On January 28, 2022, Plaintiffs filed their opposition to the motion to dismiss, which included a memorandum of law, and a declaration with an exhibit.  (Doc. 18.)[9]  Uphold filed its reply memorandum of law on February 9, 2022, (Doc. 22), and a declaration with exhibits (Doc. 23).  On February 28, 2024, I held a telephonic conference with the parties during which Plaintiffs confirmed that they are citizens of California and Arizona for purposes of diversity.  At that conference, Defendant stated that it had done some diligence on this jurisdictional issue, and informed me that it had no reason to doubt Plaintiffs' representations.

## III.     **Legal Standard**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim will have "facial plausibility when the plaintiff

---

[9] On January 28, 2022, Plaintiffs also filed a motion for judicial notice of filings Uphold made in a related action that Sandoval previously filed against it in California.  (Doc. 19.)  Defendant did not oppose that motion.  Courts "routinely take judicial notice of documents filed in other courts."  *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).  Accordingly, Plaintiffs' motion for judicial notice is GRANTED.

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner*, 496 F.3d at 237. "A complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Nicosia v. Amazon.com, Inc*., 834 F.3d 220, 230 (2d Cir. 2016) (internal quotation marks and citation omitted). A court "may also consider matters of which judicial notice may be taken" in ruling on a motion to dismiss. *Staehr v. Hartford Fin. Servs. Grp., Inc*., 547 F.3d 406, 425 (2d Cir. 2008). A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Finally, although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*

## IV.   <u>Discussion</u>

Before I address the substance of the motion, I must resolve two threshold matters. First, Plaintiffs argue that I cannot refer to the materials in the Anderson Declaration[10] at this stage of

---

[10] *See supra* note 4.

the litigation when assessing Defendants' motion to dismiss.  (MTD Opp. 23.)[11]  Defendants counter that each exhibit to the Anderson Declaration is either referred to or even directly quoted in Plaintiffs' FAC.  (Reply 9.)[12]

As mentioned *supra* note 1, a complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference," as well as any document if "the complaint relies heavily upon its terms and effect." *Chambers*, 282 F.3d at 152.  As also mentioned previously, the FAC refers to the legal effects of each of the exhibits attached to the Anderson Declaration and in fact quotes directly from two of the exhibits.  *Supra* note 4.  All of the Anderson Declaration exhibits are thus properly before me and may be considered by me at this stage of the case.

Second, Plaintiffs assert a claim for relief under the New York General Business Law ("GBL") § 349, (FAC ¶¶ 122–31), and a claim for relief "in the alterative to" their GBL § 349 claim, under the consumer protection laws of various other States "notwithstanding the Terms and Conditions" that applied to Uphold's customers, (*id.* ¶ 133).[13]  Uphold contends that no claim for relief can proceed under non-New York consumer protection laws because the Terms and Conditions governing Uphold's relationships with its customers state, "You agree that the laws of the State of New York, without regard to principles of conflicts of laws, govern these Terms and Conditions and any claim or dispute between you and us except to the extent governed by U.S. federal law."  (MTD 14; *see also* FAC ¶ 20 (quoting a portion of Uphold's

---

[11] "MTD Opp." refers to Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss.  (Doc. 18.)

[12] "Reply" refers to Uphold's Reply Memorandum of Law in Further Support of Its Motion to Dismiss.  (Doc. 22.)

[13] Plaintiffs also assert claims for fraud/fraudulent concealment, (Doc. 12 ¶¶ 135-143), and unjust enrichment (*id.* ¶¶ 144-151).

User Agreement referencing the "Terms and Conditions").)[14]  Uphold is correct that this choice-of-law provision prevents Plaintiffs from asserting claims under the laws of other States.  *See, e.g.*, *Radiology & Imaging Specialists of Lakeland, P.A. v. FUJIFILM Med. Sys., U.S.A., Inc.*, No. 20-CIV-4117 (AKH), 2021 WL 149027, at *5 (S.D.N.Y. Jan. 15, 2021) ("Plaintiff's claim for violation of the Floridian act are dismissed, because the EULA contains a broad choice-of-law provision selecting New York law as the governing law for 'any claims arising under or relating in any way' to the agreement."); *Canon U.S.A., Inc. v. Cavin's Bus. Sols., Inc.*, 208 F. Supp. 3d 494, 497 (E.D.N.Y. 2016) (Bianco, J.) ("the Court dismisses plaintiff's claims under the consumer protections laws of North Carolina, Nevada, and Florida because the parties agreed in the Dealer Agreements to a New York choice-of-law provision").  Plaintiffs do not dispute that they are precluded from asserting claims under a non-New York consumer protection statute given the governing choice-of-law provision.  Accordingly, Uphold's motion to dismiss Plaintiffs' second claim for relief is GRANTED, and that claim is dismissed.

### A.  *The GBL § 349 and Fraud/Fraudulent Concealment Claims*

#### 1.  **Applicable Law**

##### a.  Fraud/Fraudulent Concealment

Under New York law, "the elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages."  *Landesbank Baden–Wurttemberg v. Goldman, Sachs & Co.*, 478 F. App'x 679, 681 (2d Cir. 2012) (summary order) (quoting *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009)).  To plead a fraud claim, a plaintiff must

---

[14] "MTD" refers to the Memorandum of Law in Support of Defendant's Motion to Dismiss Plaintiffs' First Amended Class Action Complaint.  (Doc. 17.)

satisfy Rule 9(b)'s pleading requirements, which require that a plaintiff "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir. 1996)). A plaintiff must also "plead the factual basis which gives rise to a strong inference of fraudulent intent." *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (quoting *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990)). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 290–91 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)). A claim of fraudulent concealment requires a plaintiff to state a legally sufficient fraud claim. *See Deutsch v. JPMorgan Chase & Co.*, No. 18-CV-11655 (VSB), 2019 WL 4805689, at *12 (S.D.N.Y. Sept. 30, 2019) (dismissing a claim for fraudulent concealment after dismissing fraud claim); *Tuosto v. Philip Morris USA Inc.*, 672 F. Supp. 2d 350, 362 (S.D.N.Y. 2009) ("To state a claim for fraudulent concealment under New York law, a plaintiff must allege the standard elements of fraud" (citing *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 235 (2d Cir. 2006)).

   b.  GBL § 349

GBL § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business trade or commerce or in the furnishing of any service." "The elements of a cause of action under [GBL § 349] are that: (1) the challenged transaction was consumer-oriented; (2) defendant engaged in deceptive or materially misleading acts or practices; and (3) plaintiff was

injured by reason of defendant's deceptive or misleading conduct.  Thus, a plaintiff claiming the

benefit of these statutes must allege conduct that is consumer oriented."  *Denenberg v. Rosen*,

897 N.Y.S.2d 391 (1st Dep't 2010) (internal citations, alterations, and quotation marks omitted).

To succeed on the second element under GBL § 349, "the allegedly deceptive acts,

representations or omissions must be misleading to a reasonable consumer."  *Goshen v. Mut. Life*

*Ins. Co. of New York*, 98 N.Y.2d 314, 324 (2002) (internal citations and quotation marks

omitted).  "Whether a representation or an omission, the deceptive practice must be likely to

mislead a reasonable consumer acting reasonably under the circumstances."  *Stutman v. Chem.*

*Bank*, 95 N.Y.2d 24, 29 (2000) (internal citation and quotation marks omitted).  "This is an

'objective test' that 'may be determined as a matter of law or fact (as individual cases

require).'"  *Izquierdo v. Panera Bread Co.*, 450 F. Supp. 3d 453, 461 (S.D.N.Y. 2020) (quoting

*Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 287 (S.D.N.Y. 2014)).

With regard to the third element under GBL § 349, there is "no requirement that an

injured party show reasonable reliance on erroneous statements. . . . The plaintiff, however, must

show that the defendants' 'materially deceptive act' caused the injury" of which he complains.

*Stutman*, 95 N.Y.2d at 29 (citations omitted).

In general, GBL § 349 "contemplates actionable conduct that does not necessarily rise to

the level of fraud."  *Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 343 (1999).

Because of this, where a GBL § 349 claim fails, a similarly-premised fraud claim will often also

fail.  *See, e.g.*, *Morales v. Kimberly-Clark Corp.*, No. 18-CV-7401 (NSR), 2020 WL 2766050, at

*6, *9 (S.D.N.Y. May 27, 2020) (dismissing GBL §§ 349 and 350 claims premised on a "failure

to warn" in part because the complaint did not plausibly allege that defendant had any

knowledge of the alleged defect, and dismissing fraudulent misrepresentation/concealment claim

because plaintiff failed to sufficiently plead knowledge or scienter); *Reyes v. Crystal Farms Refrigerated Distribution Co.*, No. 18-CV-2250 (NGG) (RML), 2019 WL 3409883, at *4 (E.D.N.Y. July 26, 2019) (dismissing GBL §§ 349 and 350 claims and fraud and negligent-misrepresentation claims because plaintiff "has not alleged that either of the representations at issue were false."); *Daniel v. Tootsie Roll Indus., LLC*, No. 17-CV-7541 (NRB), 2018 WL 3650015, at *15 (S.D.N.Y. Aug. 1, 2018) ("For essentially the same reasons as we concluded that the slack-fill in the Products did not constitute a 'material misrepresentation' for purposes of GBL §§ 349, 350, and 350-a, plaintiffs fail to plead reasonable reliance" in support of their fraud claims).

### 2.    Application[15]

#### a.    Uphold's Marketing Practices Around Earn Were "Consumer-Oriented"

Uphold's lead argument is that any statements it made about Earn are not governed by GBL § 349 because "CredEarn is not a consumer product contemplated by GBL § 349."  (MTD 9.)  Uphold is correct that a number of cases have said that GBL § 349 is "inapplicable to claims involving securities transactions" because those cases involve "investors . . . seeking income . . . not consumers . . . purchasing traditional good or services."  *See, e.g.*, *In re Evergreen Mut. Funds Fee Litig.*, 423 F. Supp. 2d 249, 264–265 (S.D.N.Y. 2006) (citing *Morris v. Gilbert*, 649 F.Supp. 1491 (E.D.N.Y.1986) and *Gray v. Seaboard Secs., Inc.*, 14 A.D.3d 852 (3d Dep't 2005)).  However, these cases fail to account for controlling New York case law finding that

---

[15] Plaintiffs argue that Uphold is judicially estopped from contesting the applicability of GBL § 349 due to representations Uphold made in a prior action in California state court. (*See* MTD Opp. 5–6.) This argument is borderline-frivolous, because the exhibit Plaintiffs filed in support of its argument, from the California state court action, plainly states that "Uphold reserves its right to contest allegations that it violated . . . statutes" including GBL § 349. (Doc. 18-2, at 3 n.2.) Therefore, I find that Uphold is not judicially estopped from contesting the applicability of GBL § 349.

"consumer oriented" conduct can give rise to claims under GBL § 349 where the plaintiff demonstrates an "extensive marketing scheme that had 'a broader impact on consumers at large.'"  *Gaidon*, 94 N.Y. at 344 (quoting *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995)); *see also Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*, 37 N.Y.3d 169, 177 (2021) (reversing lower court because "there is no textual support in General Business Law § 349 for a limitation on the definition of 'consumer' based on use" of a particular good or service).

In *Oswego*, a not-for-profit opened two savings accounts with a bank and later calculated that the bank "had not been paying interest on principal" passed a certain "cap, which allegedly resulted in lost interest [payments] of" about $30,000.  85 N.Y.2d at 22–24.  The not-for-profit's contention was that the bank's practices in dealing with it had led it to believe it would be paid the lost interest amount.  *See id.*  The Court of Appeals held that "the acts of [the bank] fall within the 'consumer-oriented' ambit of [GBL] § 349," because the bank "dealt with plaintiffs' representative as any customer entering the bank to open a savings account, furnishing the [plaintiffs] with standard documents presented to customers upon the opening of accounts.  The account openings were not unique to these two parties, nor were they private in nature or a single shot transaction."  *Id.* at 26 (internal quotation marks omitted).  *See also Gaidon*, 94 N.Y.2d at 344 ("practices" that "involv[e] an extensive marketing scheme that ha[ve] a broader impact on consumers at large" "satisfy [GBL] § 349" (citation omitted)); *Cohen v. U.S. Fid. & Guar. Co.*, No. 04-CV-5921 (RMB)(MHD), 2005 WL 1036097, at *3 (S.D.N.Y. May 4, 2005) ("Plaintiff sufficiently alleges that the Scheme was 'consumer oriented' and that [d]efendants informed 'all insureds'" on the same basis, even though all had separate insurance contracts).

Here, Plaintiffs have alleged that Uphold marketed itself as "providing consumers

15

worldwide with convenient and secure access to" cryptocurrency trading.  (FAC ¶¶ 23–25).

They further allege that Uphold engaged in consumer-facing "marketing . . . relating to its

Universal Dollar" and the "Earn" product.  (*Id.* ¶¶ 54–57.)  In other words, "[Uphold]'s conduct

is not unique to the parties" to this action.  *Matthew Bender & Co.*, 37 N.Y.3d at 178.  Plaintiffs

allege that "whenever a customer bought cryptocurrency on Uphold, Uphold would display an

advertisement to the customer promoting Earn as a way to earn interest on their cryptocurrency."

(FAC ¶ 58.)  Uphold allegedly has "seven million customers."  (*Id.* ¶ 1.)  Plaintiffs have thus

alleged that its marketing of Earn, both on its platform and off, "is consumer oriented."  *Matthew

Bender*, 37 N.Y.3d at 178.

### b.  Uphold's Allegedly Misleading Practices

"[I]n determining whether a reasonable consumer would have been misled by a particular

advertisement, context is crucial.  For example, under certain circumstances, the presence of a

disclaimer or similar clarifying language may defeat a claim of deception."  *Fink v. Time Warner

Cable*, 714 F.3d 739, 742 (2d Cir. 2013) (per curiam) (finding a disclaimer defeated a GBL §

349 claim).  "[W]here the overall impression of the representations is misleading . . . the

disclaimer is not a defense as a matter of law" if it does not clear up the alleged misimpression,

but if "the disclaimer addresses the precise deception alleged in plaintiffs' complaint," there is

"no possibility that a reasonable consumer would have been misled."  *Compare Matthew Bender

& Co.*, 37 N.Y.3d at 180–181 (holding disclaimer effective on a motion to dismiss), *with

Gaidon*, 94 N.Y.2d at 345 ("the disclaimers . . . do not speak to the true, unrevealed nature of the

relationship between . . . interest rates and the vanishing dates as represented" because

"[c]onsumers vary in their level of sophistication" as to the "arithmetic" underlying the

calculation of life insurance premiums).

"In evaluating the efficacy of such a disclaimer, courts consider factors such as the font

size, placement, and emphasis.  Courts routinely conclude that the presence of a disclaimer, considered in context, precludes the finding that a reasonable consumer would be deceived by the defendant's conduct."  *Bowring v. Sapporo U.S.A., Inc.*, 234 F. Supp. 3d 386, 390 (E.D.N.Y. 2017) (internal citations omitted).

Plaintiffs allege that Uphold misrepresented "the 'Earn' program as . . . part of the family of [Uphold's] own products," (FAC ¶ 53), and pled various advertisements for Earn that Uphold published and various ways that "Uphold presented 'Earn' as an Uphold product" through marketing and through user interface elements on Uphold's website, (*Id.* ¶¶ 54–59).  Plaintiffs then allege that "[a]t no time during the pendency of the 'Earn' program did Uphold disclose that the 'Earn' program was simply an investment in Cred."  (*Id.* ¶ 61.)  From these allegations, in their opposition to Uphold's motion to dismiss, the thrust of Plaintiffs' arguments is that Uphold's marketing and user interface created the overall impression that Earn was an Uphold product that "gave consumers a false sense of safety and security."  (*See* MTD Opp. 10–13.)[16]

---

[16] Plaintiffs also identify a handful of specific statements that they believe were misleading, but they fail to carry their burden of pleading facts showing that the statements were likely to be misleading to "a reasonable consumer acting reasonably under the circumstances."  *Stutman*, 95 N.Y.2d at 29.  For example, Plaintiffs argue that Uphold misrepresented the interest rates one could be paid from investing in Earn.  (MTD Opp. 12–13 (citations omitted)).  One pleaded statement is that "users of CredEarn could 'earn up to 10% on #crypto,'" while another is that "Cred currently offers Uphold customers highly competitive rates . . . up to 12% APY."  (FAC ¶¶ 57(b)–(c).)  Plaintiffs do not allege that Earn customers could not receive these interest rates or that Earn never paid out any customers at these interest rates.  *Cf. Stutman*, 95 N.Y.2d at 31 (affirming dismissal of a GBL § 349 claim on a motion to dismiss where "[t]he nub of plaintiffs' complaint is that the $275 'attorney's fee' was really a prepayment charge in disguise," but finding that "plaintiffs have not demonstrated that the fee was a prepayment charge.").

Similarly, Plaintiffs argue that Uphold misled customers into having a "false sense of safety and security" about Earn by issuing a 2018 press release stating that the then-yet-to-be-launched Uphold Earn product "functions much like a traditional banking product."  (*See* MTD Opp. 11; FAC ¶ 30 (emphasis removed)).  However, Plaintiffs fail to "allege in any detail how this use was false or misleading, but rather, rely on conclusory statements in the [FAC]."  *Compare Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 452 (S.D.N.Y. 2008) (finding "[p]laintiffs have failed to satisfy their pleading burden" showing how "Bodisen's repeated use of the term 'Biotech' was materially false and misleading"), *with Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (in a securities case, "plaintiffs must do more than say that the statements in the press releases were false and misleading; they must demonstrate with specificity why and how that is so.").  Plaintiffs have pleaded no facts and have provided no explanation as to why a reasonable consumer would have construed the phrase "functions like a traditional banking product" as some assurance of Earn's safety as an investment vehicle.

However, Plaintiffs also plead a disclaimer that Uphold customers read before being "funneled . . . to the Cred website," which is where they actually bought into Earn.  (*Id.* ¶ 70.) This disclaimer, which is pictured in full *supra* p.5, states, among other things,

> Any agreement you enter into with CRED LLC will not amend, replace or supersede any existing agreement(s) with Uphold that you may have.  Uphold will not be a party or third-party beneficiary to any agreement you may have with CRED LLC and will have no liability for any transactions initiated by you with or through CRED LLC. . . . .  Uphold is not a lender, loan broker, or loan arranger with respect to the Cred Program and is not offering anyone advice or assistance to any person with respect to the CredEarn Program or the Cred Program.

(Anderson Decl. Ex. 3.)  The disclaimer covers the entire center of the webpage a customer would see before being redirected to Cred's website, and a customer would only be redirected if a customer clicked a button reading "Continue" at the bottom of the disclaimer.  (*See Id.*)

Under the facts of the case as pleaded, then, the disclaimer "addresses the precise deception" by dispelling Plaintiffs' theory that Uphold created the "overall impression" that Earn was an Uphold product. *Cf. Matthew Bender & Co.*, 37 N.Y.3d at 180–181.  In spite of Plaintiffs' characterizing the disclaimer as "boilerplate," (MTD Opp. 19), the language speaks precisely to the reality that buying into Earn was a "transaction initiated by [the customer] with or through Cred LLC," and that "Uphold will have no liability for any [such] transaction," (FAC ¶ 71).[17]  Especially given that the disclaimer appears with a bolded heading reading "You are about to be redirected to a third party site," (Anderson Decl. Ex. 3), I find that, on the facts

---

[17] This renders inapposite the line of cases, cited by Plaintiffs, in which disclaimers are held not to defeat a claim because such disclaimers fail to "track[] the substance of the alleged misrepresentation."  (MTD Opp. 19 (quoting *Grumman Allied Indus., Inc. v. Rohr Indus, Inc.*, 748 F.2d 729, 735 (2d Cir. 1984).)  The *Grumman* case itself found a disclaimer effective to defeat a misrepresentation claim.  748 F.2d at 735.  The only case about a disclaimer in the GBL § 349 context that Plaintiffs cite found that the misleading practices at issue were "outside the scope of the disclaimer" that defendants in that case raised.  *Watts v. Jackson Hewitt Tax Serv., Inc.*, 579 F. Supp. 2d 334, 348 (E.D.N.Y. 2008).  As discussed, Uphold's disclaimer speaks to the reality that buying into Earn meant doing business with a third party—Cred—and not with Uphold.

before me, "a reasonable consumer acting reasonably under the circumstances" would not have

been misled into thinking he was about to do business with Uphold despite the disclaimer to the

contrary.  *See Oswego*, 85 N.Y.2d at 26; *see also, e.g.*, *Chufen Chen v. Dunkin' Brands, Inc.*, 954

F.3d 492, 501 (2d Cir. 2020) ("there can be no section 349(a) claim when the allegedly deceptive

practice was fully disclosed" in the advertisements (internal citation omitted)); *Bowring v.*

*Sapporo U.S.A., Inc.*, 234 F. Supp. 3d 386, 391 (E.D.N.Y. 2017) (finding that a reasonable

consumer would not be misled where the alleged deceptions "are eclipsed by the accurate

disclosure statement" on the packaging); *Nelson v. MillerCoors, LLC*, 246 F. Supp. 3d 666, 676

(E.D.N.Y. 2017) (finding disclaimer on product label warranted dismissal where product

"utilize[d] no exterior packaging that would obstruct the disclaimer" (internal quotation marks

omitted)); *Fermin v. Pfizer Inc.*, 215 F. Supp. 3d 209, 212 (E.D.N.Y. 2016) (dismissing

plaintiffs' claim that the different sizing of the ibuprofen packaging was misleading because

"[p]laintiffs provide no basis for disregarding the clearly stated pill-counts on the labels").

In particular, given that the applicable law considers "deceptive" those "acts and

practices" that are "likely to mislead a reasonable consumer acting reasonably under the

circumstances," in this case, the question becomes whether "a reasonable consumer in

[P]laintiff[s'] circumstances" of considering purchasing Cred—a product that promised

anywhere from a 10% to 13% "guaranteed return," (FAC ¶ 78)—"might have been misled by

[Uphold]'s conduct."  *Oswego*, 85 N.Y.2d at 26–27.  How this standard applies varies with

products and with contexts.  *See, e.g.*, *id.* at 27 ("the [defendant]'s liability under [GBL § 349]

will depend, in part, on whether plaintiffs possessed or could reasonably have obtained the

relevant information they now claim the Bank failed to provide" regarding the applicable interest

rates on their accounts); *Daniel v. Mondelez Int'l, Inc.*, 287 F. Supp. 3d 177, 194 n.16 (E.D.N.Y.

2018) (in food packaging case, "consumers only care about density of packaging as it relates to the amount or quantity of product"); *Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 403 (E.D.N.Y. 2010) ("Plaintiff pleads nothing to suggest that she, or other class members, cared about [the packaged food product's] density."). Here, Plaintiffs plead nothing about what a reasonable consumer of an investment product with a high "guaranteed return" would care about, or the other materials about the Earn product that were available to them before they entered into their transactions with Cred. Indeed, Plaintiff alleges nothing about transacting with Cred at all—there are no allegations as to any disclosures Cred made or the documents that governed any agreements Plaintiffs entered into with Cred. As such, I cannot find that Plaintiffs were confronted with statements that could have misled a reasonable consumer acting reasonably under these circumstances.

Plaintiffs also argue that Uphold is liable under GBL § 349 because it failed to disclose its "superior knowledge . . . about the dire financial conditions at Cred" while it was still promoting Earn. (MTD Opp. 13.) "To determine whether a plaintiff has specifically alleged defendants' knowledge of facts or access to information contradicting their public statements, Second Circuit cases uniformly rely on allegations that (1) *specific* contradictory information was available to the defendants (2) *at the same time* they made their misleading statements." *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (Sullivan, J.) (internal citations and quotation marks omitted) (emphasis in original); *see also Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.").

Here, Plaintiffs have pleaded that Uphold stated publicly it knew nothing about Cred's moribund financial situation until October 23, 2020, at which point it had already discontinued

access to Earn.  (FAC ¶¶ 65–68.)  Plaintiffs argue in their pleadings that Uphold had access to some further information about Cred because it "assisted in Cred's operations" and "acted as Cred's custodial wallet," (*id.* ¶¶ 49–50),[18] but this is an argument of "little more than [d]efendants 'must have known' based on their roles," which is insufficient.  *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 403 (S.D.N.Y. 2019).[19]

### c.  Plaintiffs' Fraud/Fraudulent Concealment Claim is Dismissed

Because I find that Plaintiffs have failed to plead a "material misrepresentation for purposes of GBL []§ 349," their fraud/fraudulent concealment claim also fails.  *See Tootsie Roll Indus.*, 2018 WL 3650015, at *15 (internal quotation marks omitted).  Therefore, Uphold's motion to dismiss Plaintiffs' third claim for relief is GRANTED, and the claim must be dismissed.

### B.  *Plaintiffs' Unjust Enrichment Claim*

"To state a claim for unjust enrichment under New York law, a plaintiff must allege that '(1) the defendant was enriched, (2) at the expense of the plaintiff, and (3) it would be inequitable to permit the defendant to retain that which is claimed by the plaintiff.'"  *Koenig*, 995 F. Supp. 2d at 290 (quoting *Baron v. Pfizer, Inc.*, 42 A.D.3d 627, 629 (3d Dep't 2007)).

---

[18] Plaintiffs' pleadings about Uphold's relationship with Cred all appear drawn from the Examiner's Report.  (*See* Examiner's Report 19 ("For Cred, Uphold assisted with operations and acted as its customer wallet.").)  Neither Plaintiffs nor the Examiner's Report proffer any facts suggesting that Uphold's relationship with Cred would have allowed it access to information about Cred's financial struggles.

[19] This same reasoning forecloses Plaintiffs' argument that Uphold had knowledge about Cred because Cred's CEO sat on Uphold's board of directors, (FAC ¶¶ 46, 48), as Plaintiffs plead no facts and offer no law suggesting that Uphold would have had knowledge of or even access to Cred's true financial condition prior to when Uphold made its October 2020 announcement about Earn.  *See In re Morgan Stanley Derivative Litig.*, 542 F. Supp. 2d 317, 322 (S.D.N.Y. 2008) (rejecting "isolated and conclusory references to the board's concealment of, or failure to disclose" certain information where "[t]here are no particularized allegations as to when any board member had any knowledge of the Wells Notice, no allegations explaining any process by which the board decided to omit the information, and no allegation that the board actively or purposefully made a decision to omit the information." (internal citation and quotation marks omitted)).

"An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim," nor is it "a catchall cause of action to be used when others fail." *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790–791 (2012).

Plaintiffs' unjust enrichment claim is premised on their allegations that, by "[a]cting as Cred's custodial wallet with full control over the funds, Uphold improperly retained consumers['] funds after Cred's collapse."  (MTD Opp. 21 (internal quotation marks omitted) (citing FAC ¶¶ 13, 50.)  Plaintiffs also argue that their claim is premised not just on "the interest earnings Uphold promised them on their investment with Earn," but also on allegations that Uphold has "denied [Plaintiffs] access to their principal investments in Earn in their Uphold wallets."  (*Id.*)  In other words, Plaintiffs are using their unjust enrichment claim to seek the money they invested in Earn due to Uphold's purportedly misleading practices.  However, their unjust enrichment claim merely "duplicates" their GBL § 349 claim.  *Corsello*, 18 N.Y. 3d at 790.[20]  Therefore, it is DISMISSED.

## C.  *Leave to Amend*

Rule 15(a) provides that leave to amend a pleading should be "freely give[n] . . . when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "Leave to amend, though liberally granted, may properly be denied for:  undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the

---

[20] Upon repleading, leave for which I grant *infra*, to the extent Plaintiffs are able to plead an unjust enrichment claim that is not duplicative of their other claims, it may be the case that Cred's bankruptcy prevents me from adjudicating any unjust enrichment claim.  For example, the court overseeing Cred's bankruptcy has approved a stipulation between Uphold and Cred premised on Uphold's being "in possession of or [having] control[] [over] property of [Cred]," including "certain crypto currency."  *In re Cred Inc.*, Case No. 20-12836 (JTD), Doc. 373-1 (D. Del. Jan. 20, 2021).  As such, if Plaintiffs' repleaded unjust enrichment claim would require me to adjudicate Plaintiffs' claim to property within the *Cred* bankruptcy court's exclusive jurisdiction, the parties should be prepared to brief whether I can adjudicate such a claim notwithstanding any order of the *Cred* bankruptcy court or any stay order arising from the *Cred* bankruptcy.  *See generally* 11 U.S.C. § 362.

opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Ruotolo v. N.Y.C.*, 514 F.3d 184, 191 (2d Cir. 2008) (internal quotation marks omitted).

Plaintiffs conclude their opposition brief by requesting "leave to amend" "any part of the Complaint [that] is subject to dismissal." (MTD Opp. 25.)  Uphold nowhere opposes Plaintiffs' request.  Accordingly, Plaintiffs' request for leave to amend is GRANTED.  However, Plaintiffs may not replead their claim brought under consumer protection laws of states other than New York, as doing so would be futile given the choice-of-law provision in Uphold's Terms and Conditions. *See supra* p. 10.

### V.   Conclusion

For the foregoing reasons, Uphold's motion to dismiss Plaintiffs' Amended Complaint is GRANTED.  Plaintiff's motion for judicial notice is also GRANTED.  In addition, Plaintiffs' request for leave to amend their First Amended Complaint is GRANTED.  Plaintiffs must file a second amended complaint within 28 days of entry of this Opinion & Order.  The Clerk of Court is respectfully directed to close the open motions at Docs. 14 and 19.

SO ORDERED.

Dated:  March 27, 2024
        New York, New York

*Vernon Broderick*

Vernon S. Broderick
United States District Judge