```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

ADDISON SANDOVAL, LIONEL DUCOTE,
NICHOLAS KING, and RICHARD NEAL,
on behalf of themselves and other individuals
similarly situated,

                        Plaintiffs,

      -v-                                                   No.  1:21-CV-7579-LTS-BCM

UPHOLD HQ INC.,

                        Defendant.

-------------------------------------------------------x
```

<u>Memorandum Order</u>

In this putative consumer class action, Plaintiffs Addison Sandoval, Lionel Ducote, Nicholas King, and Richard Neal (together, "Plaintiffs"), individually and on behalf of all others similarly situated, bring claims against Uphold HQ, Inc. ("Uphold" or "Defendant") for (1) deceptive business practices in violation of New York General Business Law ("GBL") § 349 and (2) common law fraud.  (Docket entry no. 58 (the "Second Amended Complaint" or "SAC").)   Plaintiffs allege that Uphold misled customers through various marketing practices that caused Plaintiffs to invest in a cryptocurrency investment product that ultimately lost all of its value.  The Court has subject matter jurisdiction under 28 U.S.C. § 1332.

Uphold has moved to dismiss the Second Amended Complaint for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Docket entry no. 61 (the "Motion").)  The Court has reviewed and considered thoroughly all of the parties' submissions filed in connection with the Motion.  For the following reasons, Defendant's Motion is granted with prejudice.

BACKGROUND

Familiarity with the general context and procedural history of this case is assumed for the purposes of this Memorandum Order.  The following summary is drawn from the Second Amended Complaint, the well-pleaded factual allegations of which are taken as true for the purposes of this motion practice, as well as from a document that the parties agree is integral to the Second Amended Complaint.  Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).

Factual Background

Uphold and the "Earn" Program

Uphold is a South Carolina company headquartered in New York.  (SAC ¶ 20.) Uphold was founded in 2013 and represents itself as "a digital money platform providing consumers worldwide with convenient and secure access to traditional currencies, cryptocurrencies, and other investments."  (Id. ¶ 24.)  In late 2018, Uphold announced the creation of a mass-market financial product, initially referred to as "Uphold Earn" but ultimately marketed as "CredEarn" or simply "Earn."  (See id. ¶¶ 29, 33.)  Its press releases indicated that the "Earn" product would work in conjunction with what it referred to as a "U.S. Dollar Stablecoin (Universal Dollar), a fully-transparent digital asset that is backed 1-to-1 with U.S. dollars to be held at U.S. domiciled, FDIC-insured banks."  (Id. ¶ 29.)[1]  Uphold further represented that "[t]hose customers who purchase the Universal Dollar can opt-in to Uphold

---

[1] "A stablecoin is a cryptocurrency whose value is 'pegged' (meaning tied) to another asset—often a traditional fiat currency like the US dollar. . . .  Stablecoin advocates believe these cryptocurrencies are critical for bridging 'real-world' assets like fiat currencies with digital assets on the blockchain."  (Docket entry no. 56 (the "MTD FAC OpOrd") at 2 n.2 (citation omitted).)

Earn, which functions much like a traditional banking product, and can receive attractive and competitive rates, currently as high as five percent." (Id. ¶ 30 (emphasis removed).)[2] While the Second Amended Complaint further alleges that Uphold marketed the Earn program as "safe," "secured," and "fully hedged" (id. ¶ 63), there are no allegations regarding when, where, or how these statements were communicated to Plaintiffs or any other customers.

Uphold referred to Earn in marketing materials representing that Uphold customers would have the option to "earn interest on digital assets," such as in the below marketing image:



---

[2]   The Second Amended Complaint defines "traditional banking product" as a "conventional financial service." (SAC ¶ 31 (quoting "The Role of Traditional Banking in Today's Financial Landscape," METAFINANCIES (October 17, 2023), https://www.linkedin.com/pulse/role-traditional-bankings-todays-financial-landscape-metafinancies-nvzxc).) Citing a social media post, the Second Amended Complaint asserts that "[t]raditional banking refers to 'banks offering conventional financial services, such as savings accounts, checking accounts, [and] loans[,]'" and that "traditional banks 'are renowned for the stability and trust they inspire in customers [because] [t]heir long-standing presence in the financial sector establishes a sense of security. . . [and] trust and stability.'" (Id.) "Another feature of traditional banks offering traditional banking products[,]" according to the Second Amended Complaint, is that "customers can easily access their funds." (Id.)

(Id. ¶¶ 66-67.) In a social media post, Uphold referred to Earn as "#CredEarn" and stated that it was "proud to partner with @ihaveCred to give Uphold users access to earn interest" on their cryptocurrency holdings. (Id. ¶ 69.) Uphold also represented, in social media posts and mass emails to its customers in 2020, that users of CredEarn could earn up to 10-13% interest. (Id.)

The Earn product was itself an investment instrument offered through Cred Inc. ("Cred"), a company separate from Uphold that is now in Chapter 11 bankruptcy proceedings. (Id. ¶ 34; see also id. ¶ 35 (referring to filings in Cred's bankruptcy proceedings).) According to the report of the examiner appointed in Cred's bankruptcy, "Cred was a cryptocurrency financial services platform that offered holders of cryptocurrencies the option of investing those assets with Cred (through the 'CredEarn' program) or borrowing against those cryptocurrencies (through the 'CredBorrow' program.)." (Docket entry no. 62-5 (the "Examiner's Report") at 3.) "Those participating in CredEarn agreed to invest their cryptocurrency with Cred for a finite period of time, during which Cred guaranteed those customers a predetermined rate of return." (Id.) "Although the loan agreements reviewed by the Examiner (particularly under the CredEarn program) contained terms and conditions as to repayment and yield, they did not dictate precisely how cryptocurrency proceeds would be used or invested by Cred, or include any conditions/constraints with respect to such investments." (Id.) CredEarn was thus "similar to a certificate of deposit." (Id. at 26-27.) Once a holder of cryptocurrency loaned their funds to Cred through the CredEarn product, "Cred would then convert [the] cryptocurrency assets . . . into fiat currency and use the proceeds to make loans." (Id. at 27.) "Cred would generate profits based on the spread between the interest rate offered to customers and the rate charged by Cred under the relevant loans." (Id.)

From the perspective of an Uphold user, upon purchasing "cryptocurrency on Uphold, Uphold would display an advertisement referencing its partnership with Cred and representing that Cred products allowed Uphold customers to earn interest on their assets." (Id. at 33; SAC ¶ 70 (citing Examiner Report at 33).) Uphold also directed its customers to Earn by featuring "an 'Earn' dashboard" within a customer's digital "wallet" on Uphold's website and app, which showed "the status and value of [a customer's] interest earning investments." (SAC ¶ 72.)

Prior to being transferred to "the Cred website" to participate in the Earn program, "Uphold . . . provided a disclaimer" (the "Disclaimer") to customers. (Id. ¶ 83.) The Disclaimer stated, among other things,

> You are leaving Uphold and going to a third-party site . . . . Uphold and its affiliates are not responsible for the products, services, and content on the third-party website. Any agreement you enter into with CRED LLC will not amend, replace or supersede any existing agreement(s) with Uphold that you may have.

(MTD FAC OpOrd at 4.) The Disclaimer also stated that that "the CredEarn Program is offered solely by Cred LLC to Non-U.S. Persons." (Id.; see also SAC ¶ 86.) The Disclaimer appeared as a separate notice and warning on Uphold's website—to proceed to Cred's website and to buy into Earn, customers first had to click a continue button at the bottom of the Disclaimer. (MTD FAC OpOrd at 5.)[3] Once on the Cred website, Uphold users would see "displayed 'Total Uphold Assets' in the upper right-hand corner." (SAC ¶ 83.)

---

[3] Uphold's Terms and Conditions state: "We may partner with other third-party service providers to offer users different funding options and financial instruments ('Third-Party Programs'). By registering for and/or using any Third-Party Programs, you expressly agree that you have read, understand and accept all the applicable terms and conditions that may apply." (MTD FAC OpOrd at 5 n.5 (citation omitted).)

Cred's Bankruptcy and the End of the Earn Program

On or around October 23, 2020, Uphold removed the facility for its customers to access Earn, including its customers' ability to withdraw Earn funds; that same day it also sent its customers an email about Earn's discontinuation. (Id. ¶ 78.) After Cred filed for bankruptcy, Uphold published a document entitled "Cred: An open letter to affected users from Uphold's CEO." (Id. ¶ 81.) In this letter, Uphold stated that it was not aware of any "financial irregularities at Cred until October 23, 2020, at 11:45 am (EDT) when it was contacted by a journalist looking to corroborate a story about Cred 'losing several million in client funds.'" (Id.) Cred filed its Chapter 11 bankruptcy petition on November 7, 2020. In re Cred Inc., No. 20-12736-JTD, docket entry no. 1 (D. Del. Nov. 7, 2020).

According to the Examiner's Report from Cred's bankruptcy, Cred failed during the "'flash crash' in cryptocurrency trading value" that came in March of 2020, which in turn caused a liquidity crisis. (Examiner's Report 3.)[4] In the Examiner's view, "Cred's corporate managers did not run the business to effectively counterbalance [the] risk" of "[s]wings in cryptocurrency trading value" and engaged in a "dereliction" of proper management. (Id. at 3-4.) Cred's CEO, Daniel Schatt, was one of Uphold's board members and Cred's "sole director . . . in charge of all operational issues." (SAC ¶¶ 35-36.) "For Cred, Uphold assisted with operations and acted as its customer wallet." (Examiner's Report 32.) "Uphold was a customer generator for Cred[.]" (Id. at 33.) "Under the customer agreements furnished to the Examiner,

---

[4] The Examiner's Report sets forth more details to explain what precipitated Cred's bankruptcy, including that Cred was heavily invested with a Chinese microlender called "moKredit," which was owned by Cred's co-founder and 50% owner Lu Hua. (Examiner's Report 6.) After the flash crash, "Cred had to repatriate substantial capital from moKredit, but moKredit was not positioned to return any capital." (Id.)

Cred retained the discretion to invest funds obtained from Uphold customers as it saw fit (no differently than any other CredEarn customer)." (Id.)

On or about October 23, 2020, Uphold customers who had invested in Earn were no longer able to access their Earn balances on the Uphold platform. (SAC ¶¶ 78, 80.) This denial of access affected Plaintiffs financially.[5] For example, Mr. Sandoval made investments totaling $45,411 into Earn through his Uphold wallet—with money initially wired from his bank account—from July 1, 2020 to October 12, 2020. (Id. ¶¶ 90-91.) Each of Mr. Sandoval's Earn investments—which were made in amounts ranging from $2,500 to $7,494—were for six-month periods at a "guaranteed" rate of return of either 10% or 13% per year. (Id. ¶ 91.) In October 2020, once Mr. Sandoval learned that Earn was discontinued, he contacted his bank, which "issu[ed]" him a "provisional credit of $10,000." (Id. ¶ 95.) On December 3, 2020, Uphold closed Mr. Sandoval's account and sent him an email stating, among other things, "Don't worry, your funds are safe and we'll be in touch shortly about handling any available balance." (Id. ¶ 96.) Shortly thereafter, Mr. Sandoval was suspended from using Uphold. (Id. ¶ 97.)

Uphold's Knowledge of Cred's Financial Troubles

The Second Amended Complaint alleges that Uphold knew, or should have known, about the decisions and events leading up to Cred's bankruptcy for six reasons. "First, pursuant to a partnership agreement entered in early 2019 between Uphold and Cred, Uphold acquired the marketing rights for, and provided Uphold users with predominant (and, upon information and belief, in late 2020, possibly exclusive) access to, the investments in Cred (through the 'Earn' program). Throughout 2019, Uphold was a primary source for customer

---

[5]    The SAC details each Plaintiff's individual investments in the Earn product. (See SAC ¶¶ 89-119.)

leads for Cred." (Id. ¶ 55.)  "Second, Mr. Schatt, Cred's CEO, who also served as one of its only two Board Members and Director of Operations (in fact, the person solely responsible for operations) also served as a Director on Uphold's (small) Board." (Id. ¶ 56.)  "Third, in the Earn program's planning stages, Uphold's senior executives met with Hua and the MoKredit team 'multiple times' to understand the details of MoKredit's yield-earning model, which was the foundation of Cred's promise to pay interest to participants in the Earn program." (Id. ¶ 57.) "Indeed, Dan Schatt directly testified that '. . . others at Uphold were fully aware of Cred's business model' . . . [and] that he personally informed Uphold of Cred's dire financial situation well before Cred filed for bankruptcy." (Id.)  Fourth, "Uphold had substantial control over the Earn program[,]" as exemplified by a statement of work (the "Statement of Work") that specified that Cred "could not change Earn's core business plan, interest rates, or marketing strategy and materials without Uphold's consent." (Id. ¶ 58.)  Fifth, "Uphold exerted financial control over Cred because it acted as Cred's custodial wallet." (Id. ¶ 59.)  Sixth, and finally, the Second Amended Complaint cites an email chain from May 4, 2020, between JP Theriot, Uphold's CEO at the time, Adrian Steckel, a member of Uphold's Board of Directors, and Ricardo Salinas Pliego, "one of the richest men in Mexico and [a] highly sophisticated investor," to demonstrate Uphold's alleged knowledge of the risky nature of Cred's business model.  (Id. ¶ 60.)  In that email chain, Mr. Pliego asked what security was offered on the Cred loans (id. ¶ 45); Mr. Theriot described how the loan's "exposure was to Chinese retail lending (which has a very low default rate because people can't renew Drivers Licenses & Passports if they're delinquent, etc.)" (id. ¶ 46); Mr. Steckel responded that he had "not placed any money with Cred" due to the "lack of visibility around the way Cred deploys its money and recourse" (id. ¶ 47); Mr. Pliego asked, "WHAT IF THEY FAIL, RUN AWAY OR OTHER SHIT!" and noted, "A LOAN IS A LOAN

AND I DO NOT SEE THE COLLATERAL!" (id. ¶ 48); and Mr. Theriot responded that, while Uphold had "not yet performed a formal audit," they "should," and that he had invested his own assets with Cred and found that "[t]hey have been delivering as promised, and the product works rather smoothly" (id. ¶ 49.)

Procedural History

Plaintiffs filed their original complaint in this action on September 10, 2021, (docket entry no. 1), and their First Amended Complaint (docket entry no. 12 (the "FAC")) on December 13, 2021. Uphold moved to dismiss the First Amended Complaint (docket entry no. 14), and Judge Broderick granted the motion in full on March 27, 2024. (MTD FAC OpOrd at 23.)

As relevant here, Judge Broderick held that Plaintiffs "failed to allege that Uphold engaged in a deceptive practice within the meaning of applicable law[.]" (Id. at 2.) Specifically, Judge Broderick held that Plaintiffs failed to allege adequate facts about:

- Whether "Earn customers could not receive [the advertised] interest rates or that Earn never paid out any customers at these interest rates" (id. at 17 n. 16);

- "[W]hy a reasonable consumer would have construed the phrase 'functions like a traditional banking product' as some assurance of Earn's safety as an investment vehicle" (id.);

- Why Uphold's Disclaimer does not dispel "Plaintiffs' theory that Uphold created the 'overall impression' that Earn was an Uphold product" (id. at 18);

- "[W]hat a reasonable consumer of an investment product with a high 'guaranteed return' would care about, or the other materials about the Earn product that were available to them before they entered into their transactions with Cred" (id. at 20);

- "[A]ny disclosures Cred made or the documents that governed any agreements Plaintiffs entered into with Cred" (id.); and

- How "Uphold would have had knowledge of or even access to Cred's true financial condition prior to when Uphold made its October 2020 announcement about Earn" (id. at 21 n. 19).

Judge Broderick ultimately granted Plaintiffs' unopposed request for leave to amend the First Amended Complaint. (Id. at 23.) After Plaintiffs filed their Second Amended Complaint and Uphold again moved to dismiss, the case was transferred to the undersigned.

DISCUSSION

To survive a motion to dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A proper complaint cannot simply recite legal conclusions or bare elements of a cause of action; there must be factual content pleaded that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). This standard demands "more than a sheer possibility that a defendant has acted unlawfully." Id. "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 430 (2d Cir. 2011). The Court accepts as true the nonconclusory factual allegations in the Second Amended Complaint and draws all reasonable inferences in the nonmoving party's favor. Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007).

Documents Outside the Pleadings

In determining a Rule 12(b)(6) motion to dismiss, the Court may consider "the complaint, any exhibit attached to the complaint, materials incorporated in the complaint by reference, and documents that, 'although not incorporated by reference, are "integral" to the complaint.'" Jasper & Black, LLC v. Carolina Pad Co., No. 10-CV-3562-LTS, 2012 WL 413869, at *4 (S.D.N.Y. Feb. 9, 2012) (quoting Schwartzbaum v. Emigrant Mortg. Co., No. 09-

CV-3848-SCR, 2010 WL 2484116, at *3 (S.D.N.Y. June 16, 2010)). A court "may also consider matters of which judicial notice may be taken" in ruling on a motion to dismiss. Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008) (citations omitted).

Uphold requests that the Court, in considering its Motion, take judicial notice of a number of filings in the Cred bankruptcy, including the Examiner's Report. as well as criminal indictments against two former Cred employees. (Docket entry no. 63 ("Def. Mem.") at 10-11.) Uphold attached the filings as exhibits to its Motion. (See docket entry no. 62 ("Bianco Decl.").) Plaintiffs agree that the Examiner's Report was incorporated by reference in the Second Amended Complaint but argue that "[t]he Court should not consider the [other] filings in the Cred Bankruptcy Action . . . or the allegations in the Cred Criminal Indictments, because they are outside the pleadings." (Docket entry no. 64 ("Pl. Mem.") at 9.) While the Court may "take judicial notice of pleadings in other lawsuits attached to the defendants' motion to dismiss, as a matter of public record[,]" Faulkner v. Verizon Commc'ns, Inc., 156 F. Supp. 2d 384, 391 (S.D.N.Y. 2001), it may do so "only to determine what the documents stated," and "not to prove the truth of their contents," Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991). The Court, therefore, takes judicial notice of the Cred bankruptcy as well as the criminal indictments against two former Cred employees, but it does not rely on the factual findings of, or draw factual inferences from, the filings attached to the Motion.

Count I: GBL § 349

GBL § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business trade or commerce or in the furnishing of any service." "The elements of a cause of action under [GBL § 349] are that: (1) the challenged transaction was consumer-oriented; (2) defendant engaged in deceptive or materially misleading acts or practices; and (3) plaintiff

was injured by reason of defendant's deceptive or misleading conduct." Denenberg v. Rosen, 897 N.Y.S.2d 391, 395 (App. Div., 1st Dep't 2010). To succeed on the second element under GBL § 349, "the allegedly deceptive acts, representations or omissions must be misleading to a 'reasonable consumer.'" Goshen v. Mut. Life Ins. Co. of New York, 98 N.Y.2d 314, 324 (2002) (citation omitted). "Whether a representation or an omission, the deceptive practice must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'" Stutman v. Chem. Bank, 95 N.Y.2d 24, 29 (2000) (citation omitted). "This is an 'objective test' that 'may be determined as a matter of law or fact (as individual cases require).'" Izquierdo v. Panera Bread Co., 450 F. Supp. 3d 453, 461 (S.D.N.Y. 2020) (citation omitted). Furthermore, the "key" to an omission-based GBL § 349 claim "is that the defendant 'possess' the information that the plaintiff claims it improperly withheld." In re Sling Media Slingbox Advert. Litig., 202 F. Supp. 3d 352, 359 (S.D.N.Y. 2016).

In its Motion, Uphold argues that Second Amended Complaint did not, and that Plaintiffs cannot, cure the deficiencies Judge Broderick highlighted when he dismissed the First Amended Complaint on the ground that Plaintiffs failed to allege that Uphold engaged in a deceptive practice within the meaning of applicable law. (See Def. Mem. at 2.) The Court agrees, for five principal reasons.

First, the Second Amended Complaint does not allege additional facts indicating, for instance, that "Earn customers could not receive [the advertised] interest rates or that Earn never paid out any customers at these interest rates." (MTD FAC OpOrd at 17 n.16.) Plaintiffs, therefore, "fail to carry their burden of pleading facts showing that the statements were likely to be misleading to 'a reasonable consumer acting reasonably under the circumstances.'" (Id. (quoting Stutman, 95 N.Y.2d at 29).)

Second, Plaintiffs fail to explain "why a reasonable consumer would have construed the phrase 'functions like a traditional banking product' as some assurance of Earn's safety as an investment vehicle." (MTD FAC OpOrd at 17 n. 16). Instead, the Second Amended Complaint relies on a social media post that purports to describe "traditional banks" as stable, secure, and trustworthy. (SAC ¶ 31.)[6] Drawing all reasonable inferences in Plaintiffs' favor, the Court concludes that, at most, Uphold's comparison of Earn to a "traditional banking product" implied that Earn was a safe investment. However, like the allegations that Uphold marketed Earn as "safe" and "secured," the implicit representation does not constitute a material misrepresentation sufficient to state a claim under GBL § 349. Statements that a product is a "safe investment" are "generally considered, not actionable statements of fact, but mere opinion and puffery." DH Cattle Holdings Co. v. Smith, 195 A.D.2d 202, 208 (App. Div., 1st Dep't 1994). That is because "[c]ourts have found statements to be puffery as a matter of law when the statements do not provide any concrete representations" or are "expressed in broad, vague, and commendatory language[.]" Fink v. Time Warner Cable, 810 F. Supp. 2d 633, 644 (S.D.N.Y. 2011) (citations omitted).[7]

---

[6]  In their opposition to Uphold's Motion, Plaintiffs also argue that the "Dodd-Frank Wall Street Reform and Consumer Protection Act defines a "traditional bank product" as "loan, discount, deposit, or trust service." (Pl. Mem. at 12 n.3 (citing 12 U.S.C. § 1972(1)(A)). Nowhere, however, does the statute that Plaintiffs cite define or refer to "traditional bank products." In any event, Plaintiffs' proffered definition does not demonstrate how Uphold's comparison of investing in Earn, which Plaintiffs also allege was "essentially" a "loan" (SAC ¶ 32), to a "traditional banking product" was materially misleading to a reasonable consumer.

[7]  The allegation that Uphold represented Earn as "fully hedged" cannot be characterized as mere puffery because it is an objective claim about the product that could be proven true or false. See Fink , 810 F. Supp. 2d at 644. Plaintiffs, however, do not allege where, when, how, or to whom Uphold represented that Earn was "fully hedged" and, therefore, fail to supply sufficient facts to support their misrepresentation allegation.

Third, the Second Amended Complaint fails to allege facts demonstrating why Uphold's Disclaimer does not dispel "Plaintiffs' theory that Uphold created the 'overall impression' that Earn was an Uphold product." (MTD FAC OpOrd at 18). There are no new factual allegations in the Second Amended Complaint relating to the Disclaimer's statement that users participating in Earn were "leaving Uphold and going to a third-party site" and that "the CredEarn Program is offered solely by Cred LLC to Non-US Persons." (See SAC ¶¶ 82-88). Instead, the pleading merely argues that, "[b]ecause Plaintiffs and the other members of the putative Class are U.S. residents, either they (a) should have been prevented from moving forward with their investment in Earn as per the disclaimer, or (b) understood that they were investing in a different product to which the disclaimer did not apply." (Id. ¶ 87.) Plaintiffs unsuccessfully raised the same argument in their opposition to Uphold's motion to dismiss the First Amended Complaint (docket entry no. 18 at 19-20); because Plaintiffs proffer no basis for reconsideration of Judge Broderick's rejection of that argument, the Court declines to revisit the matter now. See DiLaura v. Power Auth. of State of N.Y., 982 F.2d 73, 76 (2d Cir. 1992) ("Under the doctrine of law of the case, a decision on an issue of law made at one stage of a case becomes a binding precedent to be followed in successive stages of the same litigation." (citation omitted)).

Fourth, the Second Amended Complaint fails to plead sufficient facts regarding "what a reasonable consumer of an investment product with a high 'guaranteed return' would care about, . . . the other materials about the Earn product that were available to them before they entered into their transactions with Cred[,]" or "any disclosures Cred made or the documents that governed any agreements Plaintiffs entered into with Cred." (MTD FAC OpOrd at 20.) Instead, the Second Amended Complaint merely alleges (1) that reasonable consumers would care about,

and want to know, that Earn's "guaranteed returns" relied on the performance of high-risk, predatory, unsecured loans at a 40% interest rate in China before they decided to invest in the program (see SAC ¶¶ 75, 102, 107, 112, 118), and (2) that there were no disclosures or documents provided to Plaintiffs and other consumers by Cred (id. ¶¶ 70, 106, 111, 116) because "Uphold was the marketing arm of Earn, and 100% of the marketing materials and information distributed to Plaintiffs and other consumers about Earn came from Uphold, not Cred" (Pl. Mem. at 7). These allegations do not address the deficiencies that Judge Broderick identified.

With respect to the question of whether Plaintiffs, acting as reasonable consumers, might have been misled by Uphold's conduct, Judge Broderick noted that how the applicable "standard applies varies with the products and contexts." (MTD FAC OpOrd at 19.) For instance, in Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20 (1995), the New York Court of Appeals determined that the defendant's liability under GBL § 349 depended "in part, on whether plaintiffs possessed or could reasonably have obtained the relevant information they now claim the Bank failed to provide" regarding the applicable interest rates on their accounts. Id. at 27. To adequately plead a deceptive act in violation of GBL § 349, Plaintiffs must allege sufficient facts to enable the Court to "view each allegedly misleading statement in light of its context on the product label or advertisement as a whole." Izquierdo, 450 F. Supp. 3d at 461 (citation omitted).

Here, the Court cannot assess the "context . . . as a whole" of Uphold's allegedly misleading statements because Plaintiffs failed to allege what information Cred provided to investors. Plaintiffs' assertion that no documents or disclosures were provided by Cred is implausible because it is contradicted by the Examiner's Report (acknowledged by Plaintiffs to be integral to their Second Amended Complaint), which references "loan agreements" that were

signed by participants in CredEarn and that "contained terms and conditions as to repayment and yield." (Examiner's Report at 3.)  Where, as here, "a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true."  TufAmerica, Inc. v. Diamond, 968 F. Supp. 2d 588, 592 (S.D.N.Y. 2013) (citation omitted).  Consistent with Judge Broderick's conclusion in his decision granting the motion to dismiss the First Amended Complaint, the Court concludes that, without providing the Court with a fuller account of the information that Plaintiffs had access to at the time of the allegedly deceptive conduct—rather than only the facts that support their claim—Plaintiffs cannot state a claim under GBL § 349.  (MTD FAC OpOrd at 20 (noting that the Court "cannot find that Plaintiffs were confronted with statements that could have misled a reasonable consumer acting reasonably under the circumstances" without "allegations as to any disclosures Cred made or the documents that governed any agreements Plaintiffs entered into with Cred").)

    Fifth, and finally, the Second Amended Complaint fails to allege how "Uphold would have had knowledge of or even access to Cred's true financial condition prior to when Uphold made its October 2020 announcement about Earn." (Id. at 21 n.19).  Indeed, the new allegations in the Second Amended Complaint undermine Plaintiffs' assertions that Uphold had earlier knowledge of Cred's financial problems.  For instance, the Second Amended Complaint alleges that, "in the Earn program's planning stages, Uphold's senior executives met with Hua and the MoKredit team 'multiple times' to understand the details of MoKredit's yield-earning model, which was the foundation of Cred's promise to pay interest to participants in the Earn program." (SAC ¶ 57.)  However, the complaint also alleges that, after those meetings, in May 2020, Uphold's CEO and a Board Member indicated on an email chain that there was a "lack of

visibility around the way Cred deploys its money and recourse" and that Uphold had "not yet performed a formal audit" of Cred's business model. (Id. ¶¶ 47, 49). Taken together, these statements suggest that neither Uphold's meetings with the MoKredit team in the early planning stages of Earn, nor later events, provided Uphold with superior knowledge of Cred's business model by May 2020. See In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001) ("[A] court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself[.]").

The other facts pled in the Second Amended Complaint are insufficient to render Plaintiffs' allegation that Uphold knew about Cred's dire financial situation plausible. Plaintiffs do not explain why or how (1) Uphold's role as "a primary source for customer leads for Cred" (SAC ¶ 55), (2) its role in marketing Earn as outlined in the Statement of Work (id. ¶ 58), or (3) its exertion of "financial control over Cred because it acted as Cred's custodial wallet" (id. ¶ 59) would generate superior knowledge of Cred's financial situation or business model. Likewise, the Court cannot impute Dan Schatt's knowledge of Cred's business methods and internal turmoil to Uphold. While Mr. Schatt served as a member of Uphold's Board of Directors, it is well established that "a director's knowledge may not properly be imputed to a corporation unless it is gained within the scope of his activity with respect to that corporation." Weintraub v. Texasgulf Inc., 564 F. Supp. 1466, 1470 (S.D.N.Y. 1983). The Second Amended

Complaint does not sufficiently allege that that Mr. Schatt gained his knowledge in any way other than from his work as the CEO of Cred.[8]

In sum, because the Second Amended Complaint fails to correct the deficiencies that led to the dismissal of the First Amended Complaint, the Count grants Uphold's motion to dismiss as to Count I.

Count II: Fraud/Fraudulent Concealment Claim

"To prove common law fraud, a plaintiff must show more than [GBL] § 349 requires." Miao Xin Hu v. Iovate Health Scis. U.S.A. Inc., No. 17-CV-9427-ER, 2018 WL 4954105, at *3 (S.D.N.Y. Oct. 12, 2018). Because Plaintiffs have failed to allege misrepresentations or omissions sufficient to state a claim under GBL § 349, their claim cannot meet the even more demanding pleading requirements for their common law fraud and fraudulent concealment causes of action. (See MTD FAC OpOrd at 21.) The Court therefore grants Uphold's motion to dismiss as to Count II.

---

[8] Similarly, the allegation that "Dan Schatt directly testified that '. . . others at Uphold were fully aware of Cred's business model' . . . [and] that he personally informed Uphold of Cred's dire financial situation well before Cred filed for bankruptcy" (SAC ¶ 57) is too vague and conclusory to adequately plead Uphold's knowledge. Indeed, it appears to be a conclusory summary of allegations made in an earlier pleading that a court found insufficient in Cred's bankruptcy proceedings. See In re Cred Inc., 650 B.R. 803, 824 (Bankr. D. Del. 2023), aff'd, 658 B.R. 783 (D. Del. 2024) (assessing sufficiency of identical allegations regarding Uphold's knowledge about the financial difficulties at Cred).

CONCLUSION

For the reasons discussed above, Defendant's Motion to Dismiss is granted with prejudice.[9] This Memorandum Order resolves docket entry no. 61. The Clerk of Court is respectfully directed to enter judgment in favor of Defendant and close this case.

SO ORDERED.

Dated: May 1, 2025
New York, New York

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge

---

[9] Uphold argues that the Second Amended Complaint should be dismissed with prejudice because "[t]his action already represents the third lawsuit (and fifth complaint) Plaintiffs have filed against Uphold on the instant facts in two different states[,]" and "Plaintiffs have thus had ample opportunity to amend, rewrite, and restate their purported claims[.]" (Def. Mem. at 21.) Uphold also argues that any further amendment would be futile. (Id. at 22.) Because Plaintiffs did not respond to these arguments in their opposition, the Second Amended Complaint is dismissed with prejudice.